UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FAMILY FOOT AND LEG CENTER, PA,

      Plaintiff,

v.                              Case No. _____

ROBERT F. KENNEDY, JR., Secretary of
the United States Department of Health
and Human Services; and DR. MEHMET OZ,
Administrator for the Centers for Medicare
and Medicaid Services,

      Defendants.

_____/

## VERIFIED COMPLAINT / APPEAL

COMES NOW the Plaintiff, FAMILY FOOT AND LEG CENTER, PA, a

Florida professional association ("FFLC" or "Plaintiff"), to sue the Defendants,

ROBERT F. KENNEDY, JR. as Secretary of the United States Department of Health

and Human Services (HHS), and DR. MEHMET OZ as Administrator for the Centers

for Medicare and Medicaid services (CMS), alleging as follows:

## I.   NATURE OF ACTION / APPEAL

1.    The Plaintiff respectfully requests that the District Court review the

Defendants' Final Orders in the Office of Medicare Hearing and Appeals (OMHA)

matters:

Count I:    OMHA Appeal Case No. 3-12532508877 (Docket No. M-24-3000), Beneficiary G.M. (**Exhibit A-1**)

Count II:    OMHA Appeal Case No. 3-12656964257 (Docket No. M-24-2873), Beneficiary L.E. (**Exhibit A-2**)

2.     True Copies of the Final Orders are attached hereto as **Exhibits A-1** through **A-2**. Each of these Final Orders involve the same provider (although different beneficiaries) and common questions of laws and facts, *i.e.* principally the administration by application of Procenta® to a Medicare beneficiary. In some of these cases, the agency decisions were rendered by the Administrative Law Judge and the Medicare Appeal Council with identical verbiages.

3.     Plaintiff is a podiatry practice which treats Medicare patients in Naples, Florida. In turn, Plaintiff seeks reimbursement of its fees for services rendered to Medicare beneficiaries from CMS, which is overseen by the HHS. In the appeal referenced above, CMS alleges that it overpaid Plaintiff and seeks to recoup (claw back) that money with interest thereon. Plaintiff, having exhausted the administrative appeal process pursuant to 42 C.F.R. Part 405, seeks judicial review of the Final Agency Order in accordance with 42 C.F.R. § 405.1877.

## II.     <u>JURISDICTION AND VENUE</u>

4.     This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.

5.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. §1395ff, which authorizes judicial review of final agency decisions of the Secretary.

6.     Plaintiff is filing suit after receiving the final decisions of the Secretary denying coverage of its Medicare claims and affirming overpayments and, therefore, has exhausted its administrative remedies.

7.     The amount-in-controversy is greater than $1,900.00 as set forth in 42 U.S.C. §§ 1395ff(b) and § 1869(b) of the Social Security Act.

8.     In accordance with Section 1878(f)(1) of the Social Security Act (the "Act") and 42 C.F.R. § 405.1130, this suit is timely filed within sixty (60) days of the date upon which the Plaintiff received CMS's final agency decision.

9.     In general, where a party seeks judicial review of CMS's final decision in the Medicare claims appeal context, venue is proper "in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia." 42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).

10.     Thus, venue is proper in the Fort Myers Division of the United States District Court for the Middle District of Florida, as Plaintiff conducts business within the jurisdictional territory of the Court and the cause of action arose in Naples, Florida.

### III.     THE PARTIES

11.     Plaintiff, Family Foot and Leg Center, PA, (FFLC) is a Florida professional association. FFLC provides podiatric medical services in its principal place of business at 730 Goodlette Frank Road, N, Suite 102, Naples, FL 34102.

12.     FFLC is, and has been, enrolled in the Medicare program pursuant to a Medicare Enrollment Application submitted to Centers for Medicare and Medicaid Services, and, at all times relevant to this action, followed all applicable federal statutes and regulations and was enrolled as a provider of services in the Medicare program.

13.     Defendant, Robert F. Kennedy, Jr., Secretary of Health and Human Services, United States Department of Health and Human Services ("Secretary"), maintains his principal office at 200 Independence Avenue SW, Washington, DC 20201. Secretary is being sued in his official capacity only.

14.     HHS is the federal agency of the United States of America charged with overseeing the operation of the Medicare program.

15.     Defendant, Dr. Mehmet Oz, Administrator, Centers of Medicare and Medicaid Services, Office of External Affairs, maintains his principal office at 7500 Security Blvd., Baltimore, MD 21244. The Administrator is being sued in his official capacity only.

16.     CMS operates and regulates the Medicare payment system nationwide. It also directs its contractors, who are responsible for the first two levels of administrative review of Medicare claim denials.

17.     The Office of Medicare Hearings and Appeals (OMHA) generally conducts the third level in the Medicare claims appeal process and operates separately from the other contractors involved in the appeal process.

18.    The Departmental Appeals Board (DAB) within the HHS provides the fourth level of administrative review.

19.    References to the Secretary herein are intended to include CMS, its contractors, and any of their successors or predecessors.

## IV.    <u>STANDARD OF REVIEW</u>

20.    A federal district court's review of a final decision of the Secretary as to Medicare coverage is limited to: (i) whether the Secretary's factual findings were supported by substantial evidence; (ii) whether the Secretary applied the proper legal standards; and (iii) whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A); *Sternberg v. Sec'y, Dep't Health & Human Servs.*, 299 F.3d 1201, 1205 (10th Cir. 2002) (holding that the substantial evidence test is substantively the same as the review for arbitrariness or caprice); *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 17 (D.D.C. 2018), aff'd, 943 F.3d 472 (D.C. Cir. 2019); *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 652 (E.D. Va. 2019); and *Becker v. Sebelius*, No. 12-cv-6177, 2014 WL 2711958, *1, *3 (D.N.J. June 13, 2014).

21.    Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); *see also Fratellone v. Sebelius*, No. 08-cv-3100, 2009 WL 2971751 *1, *9 (S.D.N.Y. Sept. 16,

2009) (citing *Murphy v. Sec'y of Health & Human Servs.*, 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999)).

22.    While deferential, this review "is not a rubber stamp for the Secretary's decision and involves more than a search for evidence supporting the Secretary's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (citing *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984)).

23.    The Court's factual review is limited to the administrative record. *See Mathews v. Weber*, 423 U.S. 261, 263, 270 (1976) (holding that under 42 U.S.C. § 405(g), the "court may consider only the pleadings and administrative record" and "neither party may put any additional evidence before the district court.").

24.    However, the assessment of whether substantial evidence supports a decision of the Secretary requires the court to review the administrative record as a whole. This includes looking at evidence supporting the Secretary's position, as well as other evidence that detracts from it. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d. Cir. 1990); *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002); *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021); 5 U.S.C. § 706.

25.    HHS "has codified [this] requirement in a regulation that directs the Office of Medicare Hearings and Appeals . . . to include in the record 'the appealed determinations, and documents and other evidence used in making the appealed determinations and the ALJ's or attorney adjudicator's decision,' as well as any

proffered evidence excluded by the adjudicator." *Goffney*, 995 F.3d at 747 (quoting 42 C.F.R. § 405.1042(a)(2)).

26.    In contrast to the deference due to findings of fact, the Secretary's (or in this case, Administrative Law Judge's ("ALJ")) conclusions of law as to Medicare coverage are reviewed *de novo*, and failure to apply the correct legal standards is grounds for reversal. 42 U.S.C. § 405(g); *see also Keefe*, 71 F.3d at 1062; *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

27.    Pursuant to the Administrative Procedures Act ("APA"), the Secretary's final decision may also be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1159 (9th Cir. 2012); *Porzecanski*, 316 F. Supp. 3d at 17; *LivinRite*, 386 F. Supp. 3d at 652.

28.    To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal citations omitted).

29.    In reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Porzecanski*, 316 F. Supp. 3d at 18.

30.    An agency acts arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see also Porzecanski*, 316 F. Supp. 3d at 18.

31.    The D.C. Circuit Court of Appeals has made clear that the propriety of an agency's decision is "a question of law, and only a question of law." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also Embassy of Blessed Kingdom of God for All Nations Church v. Holder*, 6 F. Supp. 3d 559, 561 (E.D. Pa. 2014), aff'd sub nom.; *Embassy of Blessed Kingdom of God for All Nations Church v. Att'y Gen. U.S.*, 591 F. App'x 161 (3d. Cir. 2014) (citing *Marshall County* for the same); *Validus Reinsurance, Ltd. v. U.S.*, 786 F.3d 1039, 1042 (D.C. Cir. 2015).

32.    In overruling the *Chevron* doctrine for agency deference, the United States Supreme Court held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

## V.    MEDICARE PROGRAM

33.    Congress enacted the Medicare Program in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older, disabled persons, and those with end-stage renal disease. Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v).

34.     The Medicare Program seeks to ensure that its beneficiaries have access to health care services and is made up of four separate parts—Part A, Part B, Part C, and Part D.

35.     Relevant to this matter, Medicare Part B refers to the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. 42 U.S.C. § 1395k(a)(1); 42 C.F.R. § 400.202. Part B supplements Part A which includes diagnostic laboratory tests and other diagnostic tests. *See also* 42 C.F.R. § 410.10.

36.     Federal courts recognize the rights of providers under the Medicare Program to reimbursement for providing services to Medicare patients. *French Hosp. Med. Ctr. v. Shalala*, 89 F.3d 1411, 1413 (9th Cir. 1996*); see also Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1132 (11th Cir. 1983) (noting that providers "are entitled to be reimbursed for reasonable costs incurred in the provision of necessary health services to Medicare beneficiaries."); *Am. Med. Int'l, Inc. v. Sec'y, Health, Educ. & Welfare*, 466 F. Supp. 605, 626 (D.D.C. 1979) ("[t]he purpose of the Medicare [P]rogram is to reimburse providers for their reasonable costs").

37.     When a medical provider, such as FFLC, furnishes services to a Medicare Part B beneficiary, the provider thereafter submits a claim for reimbursement based on the beneficiary's assignment of benefits.

38.     A Medicare provider is statutorily entitled to reimbursement for services rendered to Medicare Part B beneficiaries under 42 U.S.C. § 1395l.

39.     Providers submit these claims for reimbursement to a Medicare Administrative Contractor ("MAC"). 42 U.S.C. § 1395ff(a)(2)(A). A MAC is a government contractor responsible for processing Medicare claims and making payments. 42 U.S.C. §§ 1395kk-1(a)(3).

## A.    Entities Involved in Medicare Claims Appeal Process

40.     While CMS is the HHS agency responsible for administering the Medicare Program, CMS contracts with various private entities to assist CMS in processing and auditing claims for reimbursement and in the appeals process itself.

### i.     Medicare Administrative Contractors (MACs)

41.     CMS contracts with MACs to process and audit claims that have been submitted by Medicare providers for payment. 42 U.S.C. § 1395kk-1(a).

42.     MACs are statutorily authorized to perform the following functions: (i) determine the amount of reimbursement to providers and suppliers; (ii) pay such reimbursements to the applicable provider or supplier; (iii) provide education and assistance to Medicare Part A and B beneficiaries; (iv) provide consultative services to institutions, agencies, and others regarding maintenance of fiscal records necessary for reimbursement; (v) communicating with providers and suppliers regarding instructions from CMS; (vi) performing functions related to provider education, training, and technical assistance; (vii) developing LCDs, which are determinations "under [P]art A or [P]art B, as applicable, respecting whether or not a particular item or service is covered . . . under such parts" for the geographic zone assigned to the MAC; (viii)

10

overseeing an improper payment outreach and education program; and (ix) such other functions as are necessary or as specified in CMS's agreement with the MAC. *Id.* at §§ 1395kk-1(a)(4), 1395ff(f)(2)(B); 42 C.F.R. §§ 421.100, 421.200, 421.400.

43.    In addition, MACs handle provider enrollment, as well as redeterminations, which form the first level of the Medicare claims appeal process. 42 C.F.R. §§ 421.200, 421.404.

44.    MACs are required to follow federal statutes, regulations, and CMS program guidance.

45.    CMS provides incentives to MACs to reduce improper payment error rates, which may include: (i) a sliding scale of award fee payments and additional incentives to MACs that reduce the improper payment rates in their jurisdictions to certain thresholds, or accomplish tasks that further improve payment accuracy; or (ii) substantial reductions in award fee payments under cost-plus-award-fee contracts for MACs that reach an upper end improper payment rate threshold, or fail to accomplish tasks that further improve payment accuracy. Id. § 1395kk-1(b)(1)(D)(ii)–(iii).

### ii.    Unified Program Integrity Contractors (UPICs)

46.    CMS is authorized to contract with UPICs to fulfill program integrity functions for the Medicare Program. 42 U.S.C. § 1395ddd.

47.    Payment decisions made by MACs are commonly audited by UPICs in a process referred to as a "post-payment review." 42 C.F.R. § 421.304 *et seq*.

48.    The UPIC is authorized to: (i) prevent fraud by identifying program vulnerabilities; (ii) proactively identify incidents of potential fraud, waste, and abuse that exist within its service area and take appropriate action; (iii) investigate allegations of fraud; (iv) explore available sources of fraud leads in its jurisdiction; (v) initiate appropriate administrative actions where there is reliable evidence of fraud, including, but not limited to, payment suspensions and revocations; and, (vi) refer any necessary provider or supplier outreach to the provider outreach and education staff at the MAC. 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304; 42 C.F.R. § 405.371(a)(1); MPIM Ch. 4, § 4.2.2.1.

49.    UPICs are tasked with identifying both overpayments and underpayments. *See e.g.*, 42 U.S.C. §§ 1395ddd(b) and (h), 1395g(a); 42 C.F.R. § 421.304; MPIM Ch. 8, §§ 8.4.1.3, 8.4.4.4.4, 8.4.5.2, 8.4.7.1.

### iii.    Qualified Independent Contractors (QICs)

50.    Under 42 U.S.C. § 1395ff, CMS is mandated to "enter into contracts with qualified independent contractors to conduct reconsiderations of [redetermination decisions]."

51.    A QIC is statutorily required to be independent of any MAC or UPIC. *Id.* at § 1395ff(c)(2), (c)(3)(K). The QIC must perform such duties and functions and assume such responsibilities as may be required by CMS to carry out the Medicare claims appeal process, "and shall have sufficient medical, legal, and other expertise . . . and sufficient staffing to make reconsiderations[.]" *Id.* at § 1395ff(c)(3)(A).

52.    National coverage determinations ("NCDs"), CMS Rulings, Council decisions, and applicable laws and regulations are binding on the QIC. However, QICs are not bound by LCDs or CMS program guidance—though applicable regulations indicate that a QIC should "give substantial deference to these policies if they are applicable to a particular case." 42 U.S.C. § 1395ff(c)(3)(B)(ii)(I)–(II); 42 C.F.R. § 405.968(b)(1)–(2).

### iv.    **Administrative Law Judges (ALJs)**

53.    OMHA is responsible for the third level of the Medicare claims appeal process, whereby a reconsideration decision by the QIC is reviewed by an OMHA adjudicator, and an ALJ hearing can be requested. 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. §§ 405.1000–48.

54.    A hearing before an ALJ provides important procedural due process protections to an appellant-provider, including "the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact." *Fam. Rehab., Inc. v. Azar*, 886 F. 3d 496, 499 (5th Cir. 2018); *see also Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 753 (N.D. Tex. 2019).

55.    The ALJ reviews an appeal under a *de novo* standard, which is less deferential than the standard of review applied by a district court. *Id.* at 754; *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016) (concluding that a district court's review would be more deferential than an ALJ's *de novo* review in the Medicare claims appeal process).

13

56.    The ALJ's decision "must be based on evidence offered at the hearing or otherwise admitted into the record, and shall include independent findings and conclusions." *Id.* at § 405.1046(a)(1). Further, the ALJ's decision may not be based on extra-record documents. *Id.*

57.    CMS has explained that the "independent findings and conclusions" requirement is intended to express the requirement for *de novo* review and prohibits the ALJ from "merely incorporat[ing] the findings and conclusions offered by others" at the redetermination or reconsideration level. 82 Fed. Reg. 4974 at 5082, 5084.

58.    In addition to the specific reasons for the decision and a summary of any clinical or scientific evidence used in making the decision, the ALJ's decision must also include, "for any new evidence that was submitted for the first time at the OMHA level . . . a discussion of the new evidence[.]" 42 C.F.R. § 405.1046(a)(2)(i)–(ii).

59.    In issuing a decision, ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the ALJ. 42 C.F.R. § 405.1063.

60.    ALJs are not bound by LCDs or CMS program guidance but will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

61.    The ALJ must consider "all the issues for the claims . . . specified in the request for hearing that were brought out in the initial determination, redetermination,

or reconsideration that were not decided entirely in [the appellant's] favor." *Id.* at § 405.1032(a).

62.     The Fifth Circuit Court of Appeals has held that the effectuation of a final agency decision is "inextricably intertwined" with the agency's initial action and thus making effectuation an essential component of resolving ALJ appeals. *D&G Holdings, LLC v. Becerra*, 22 F.4th 470 (5th Cir. 2022).

63.     The ALJ's decision on a request for hearing is binding on all parties unless "a party requests a review of the decision by Council within the stated time period or the Council reviews the decision issued by an ALJ . . . and the Council issues a final decision . . . or the appeal is escalated to Federal district court under the provision at [42 C.F.R.] § 405.1132[.]" 42 C.F.R. § 405.1048(a)(1).

### v.     Medicare Appeals Council

64.     Where a party is dissatisfied with the ALJ's decision, that party may appeal the ALJ's decision to the Council. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).

65.     In reviewing the ALJ's decision, the Council is required to undertake a *de novo* review. 42 C.F.R. § 405.1100(c). In conducting its review *de novo*, the Council must consider all of the evidence in the administrative record. *Id.* at §§ 405.1108(a), 405.1122(a)(1).

66.     The Council is bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable

implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the Council. *Id.* at § 405.1063.

67.     The Council is not bound by LCDs or CMS program guidance, but it will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

68.     In reviewing an ALJ's decision, the Council will issue a final decision or dismissal order or remand a case to the ALJ within 90 calendar days. *Id.* at §§ 405.1100(c), 405.1108(a); 405.1128.

69.     Where the Council issues a decision, that decision will act as the final decision of the Secretary for purposes of 42 U.S.C. § 405(g) and § 1395ff(b)(1)(A) and is final and binding on all parties unless a federal district court issues a decision modifying the Council's decision. 42 C.F.R. § 405.1130.

**B.**     **Medicare Administrative Appeals Process**

70.     If a Medicare provider wishes to appeal a determination, or any post-payment claim denial, they are subject to the lengthy appeals process set forth in 42 U.S.C. § 1395ff. The Medicare appeals regulations allow for five levels of appeal as follows:

**Level One: Redetermination**

71.     After the initial determination that an overpayment has been made, a denied claim may be submitted to a MAC for redetermination. 42 U.S.C. §

1395ff(a)(3)(A). In the case of a denied claim, the determination is sent back to the MAC for re-review.

72.     Upon receipt of the request for redetermination, the MAC has 60 days to issue a decision. *Id.* at § 1395ff(a)(3)(C)(ii).

**Level Two: Reconsideration**

73.     If the redetermination is unfavorable, the appealing party may submit a request for reconsideration. *Id.* at §§ 1395ff(b), (c). A reconsideration is a review of the MAC's redetermination conducted by a QIC. *Id.* at §1395ff(c)(B)(i).

74.     Upon receipt of the request for reconsideration, the QIC has 60 days to issue a decision. *Id.* at § 1395ff(c)(3)(C)(i).

**Level Three: ALJ Hearing**

75.     A party that is dissatisfied with the QIC's reconsideration may request a hearing and *de novo* review before an ALJ. *Id.* at § 1395ff(b)(1)(E).

76.     Under 42 U.S.C. § 1395ff(d)(1)(A), the ALJ must conduct and conclude the hearing and render a decision no later than 90 days after the request for a hearing was filed. *See also* 42 C.F.R. § 405.1016(a).

**Level Four: Medicare Appeals Council Review**

77.     The final administrative option for appealing an unfavorable decision is an appeal to the Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1108(a).

78.     Under 42 C.F.R. § 405.1100(c), the Council undertakes a *de novo* review and issues a decision, dismissal or remands the case to the ALJ within 90 days of receipt of the request for Council review.

**Level Five: Federal District Court**

79.     Any party that is dissatisfied with the Council's decision may seek judicial review in Federal Court. 42 C.F.R. § 405.1877.

## VI.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

80.     For each of the final agency orders, the Defendants acted arbitrarily and capriciously by wrongfully denying coverage of Procenta (Q4244) and associated physician services claims (CPT 15271).

81.     The Defendants, likewise, without cause, refused to apply and/or refused to consider the application of limitation of liability provisions under Section 1879 of the Social Security Act for the claims at issue.

82.     Under Section 1879, Medicare may properly pay a claim if it is shown that the provider did not know, and could not be expected to know, that the services lacked medical necessity. 42 U.S.C. 1395pp(a).

**A.     Coverage for Q4244 and 15271**

**1)     Applicability of LCD L36377**

83.     With respect to Medicare coverage, NCDs are determinations by CMS regarding whether a particular item or service is covered (or not covered) nationally under Medicare and they are binding on MACs, QICs, ALJs, and the Council.

84.    As defined in §1869(f)(2)(B) of the Act, LCDs are determinations by MACs regarding whether or not a particular item or service is covered on a contractor-wide basis in accordance with the "reasonable and necessary" standard in §1862(a)(1)(A) of the Act. LCDs are afforded substantial deference in determination of Medicare coverage.

85.    Only in the absence of a controlling NCD or LCD, Medicare contractors would "institute claim-by-claim review to determine whether a claim [for a placental product] meets the reasonable and necessary criteria outlined under section 1862(a)(1)(A) of the Social Security Act, as well as any other applicable requirements for coverage payment in any statute, regulation, or guidance document."

86.    In 2015, CMS issued LCD L36377 entitled "Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities." In this LCD, CMS "addresses the reasonable and necessary (R&N) threshold for coverage of skin replacement surgery with particular emphasis on the indications for applications of skin substitute grafts for diabetic foot ulcers DFU and venous leg ulcers VLU."

87.    Further, LCD L36377 states:

   (a)    "[g]enerally depending on the purpose of the product and how it functions, skin substitutes are regulated by the FDA premarket approval (PMA) process, FDA 510(k) premarket notification process, or the FDA regulations for human cells, tissues, and cellular and tissue-based products, and the FDA humanitarian device exemption process"; and

   (b)    "Per the American Medical Association (AMA) and the Current Procedural Terminology (CPT), skin replacement surgery consists of surgical preparation and topical placement of an autograft

(including tissue cultured autograft) or skin substitute graft (i.e., homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation … Skin substitute graft procedures include the application of non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (e.g., homograft, allograft), non-human skin substitute grafts (i.e., xenograft), and biological products that form a sheet scaffolding for skin growth."

88.    Moreover, LCD L36377 sets forth the elements for Medicare coverage, including requirements for a period of prior failed conversative treatment and appropriate documentation.

89.    In sum, CMS has provided written guidance affirmatively allowing for Medicare coverage under LCD L36377.

90.    In the  final agency orders, the Council refused to give any deference to LCD L36377 by cherry-picking the beneficiary's medical records and, without any evidence, stating that Procenta may be "gel, ointment, foam, liquid," s*ee* **EXHIBIT A-1**, pg. 8 and **EXHIBIT A-2,** pg. 5, and may have been administered to the beneficiary via injection, *see* **EXHIBIT A-1**, pgs. 4, 8, 9, 10 and **EXHIBIT A-2**, pgs. 6, 7.

91.    For instance, according to the submitted beneficiary records for Appeal Case No. 3-12532508877 (Docket No. M-24-3000), the beneficiary was then a 68-year-old female patient who was immunocompromised secondary to chemotherapy for her metastasized spinal cancer. Shortly before the date of service at issue, the beneficiary was seen at FFLC complaining of pain in her right foot, hammer toe to her right foot, a fractured right foot phalanx, and an ulcer of the lower extremity. Cellulitis of the lower limb and ulcer of the right toe were also documented. The beneficiary was

transferred to the emergency department with diagnoses of osteomyelitis and infection to the right big toe. The wound was described in a "bottom view (L)" image of the foot as "full thickness ulceration with purulent drainage, odor, edema, and erythema present." Conservative treatment of Mupirocin, 4X4s, and Kerlix was ordered and provided. The beneficiary returned to FFLC on the date of service for wound care follow-up and Procenta placement follow-up. It was documented that the beneficiary was "offloading in surgical shoe with walker assistance." She had "full thickness ulceration plantar hallux right foot with significant edema, pus and erythema." The wound measured at 0.2cm X 0.2cm X 0.1cm. Drainage was moderate and the wound was assessed as Grade III. The wound site was debrided of non-viable tissue and Procenta was "applied via the usual steps and protocols." Particularly, the Discussion Notes state that FFLC "[d]ressed the wound site with Procenta, steristrips, gauze, cling and coban," thus dispelling the notion that the Procenta was applied via injection.

92.     It is common and an accepted standard of practice for podiatrists, such as FFLC, to apply Procenta as a skin substitute wound covering in cases such as this beneficiary. The usual steps for Procenta application, according to its manufacturer's guidance, are to remove the product from the vial and apply Procenta evenly over the surface of the wound and then cover the wound site with a non-adherent, impregnated dressing. *See* Procenta Application, Lucina Sciences, *available at* https://lucinabio.org/our-products/ (last visited January 7, 2026). These precise steps were documented by FFLC in the beneficiary's records.

93.     The Council, in its Final Order, claimed because the medical records referred to Procenta once as an "amniotic membrane/injection,"[1] the Procenta may have been applied via injection and therefore falls outside of the purview of LCD C36377. However, this ignores the fact that nowhere in the medical records does it state that a syringe of any kind was used during the administration of Procenta. In fact, in the patient records, no syringe was documented as materials used during this procedure.

94.     Moreover, the Council ignored the fact that there was no corresponding injection CPT code submitted by FFLC. Should FFLC have administered Procenta via injection, a claim for CPT 20605 (arthrocentesis, aspiration and/or injection, intermediate joint or bursa, without ultrasound guidance), 96371 (Injection of drug/substance under skin or into muscle), or similar injection codes would have been billed. On the contrary, the billed CPT codes 15271[2] and 15725[3] conclusively prove that the Procenta was applied as wound coverings, and <u>not</u> as injections. The absence of the injection administration codes further dispels the Council's conjecture that the Procenta was applied via injection.

95.     In furtherance of its position that LCD L36377 does not apply, the Council speculated that because Procenta is packaged in a vial, it could be considered

---

[1] Procenta may be used as an injectable into joints for treatment of musculoskeletal conditions only.

[2] Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less of wound surface area.

[3] Each additional 25 sq cm wound surface area, or part thereof (list separately in addition to code for primary procedure).

as "non-graft wound dressings (e.g. gel, ointment, foam, liquid)." *See* e.g. **EXHIBIT A-1**, pg. 8.

96.    According to the FDA's TRG letter dated August 19, 2020, however, Procenta is described as a product consisting of the "intermediate layer, also referred to as the spongy layer of the amniotic sac which has been mechanically separated from the amnion and/or chorion and placed into … a preservation media."

97.    In its CPT Code application, Procenta is specifically described as an "acellular, human placental-derived allograft" and "[w]hen placed in the wound bed, it acts as a hydrophilic extracellular matrix scaffold …" It is clear from the product description that Procenta is a skin substitute allograft and not a "non-graft wound dressing," thus the Council erred in its refusal to apply and/or consider coverage under LCD L36377.

98.    Given that LCD L36377 is controlling, the Council erred when it independently and unnecessarily concluded that the administration of Procenta was unreasonable and not medically necessary for the beneficiary. The same error is equally applicable to the other appeal at issue.

2)    **Medical Necessity**

99.    Even if the Council was entitled to independently conduct a medical necessity and reasonableness inquiry, it erred in ignoring the FDA's advisory opinion and selective readings of the medical literature and studies to justify the claim denial.

100.    In its TRG advisory opinion, the FDA expressly authorized the use of Procenta "to serve as a cover, to offer protection from the surrounding environment, or to retain fluid[.]"

101.    In this case, FFLC submitted unconverted clinical evidence that Procenta was in fact used as a barrier, a wound covering, and to retain moisture to promote wound healing.

102.    As such, the use of Procenta for this beneficiary falls squarely within the prescribed use as an HCT/P regulated under § 361 of the Public Health Service (PHS) Act. Nothing in the administrative record suggests that Procenta was used on this beneficiary in any other manner.

103.    While an FDA approval/exemption is not outcome-determinative in respect to Medicare coverage, it is substantial evidence of the applicable standard of care. It was an error for the Council to simply cast aside the FDA TRG's advisory opinion and base its medical necessity and reasonableness determination on nothing more than conjecture and speculation.

104.    FFLC also submitted a number of medical treatises and clinical studies that attest to the safety and effectiveness of placental derived skin substitute for treatment of wounds.

105.    FFLC vigorously disagrees with the Council's interpretation of the submitted medical literature.

106.    According to the Technology Assessment Program – Technical Brief, Skin Substitutes for Treating Chronic Wounds, commissioned by the Agency for Healthcare Research and Quality, U.S. Department of Health and Huaman Services ("Technical Brief"), the usual care or standard care for established chronic wounds incorporates common principles, as follows, that apply to managing all wound types:

- Remove necrotic tissue through debridement (typically sharp debridement).
- Maintain moisture balance by selecting the proper wound dressing to control exudate.
- Take measures to prevent or treat wound infections.
- Correct ischemia in the wound area.
- For venous leg ulcers, apply some form of compression.
- For diabetic foot ulcers, apply some form of offloading.

107.    The Technical Brief further states that "[i]f chronic wounds fail to respond to standard of care, skin substitutes may be used as an adjunct to establish chronic wound care methods to increase the likelihood of complete healing."

108.    These researchers have found that skin substitutes have functional and structural characteristics that closely match those of autologous skin: "The ideal skin substitute should be durable, completely autologous, endothelialized and contain adnexal structures and adult stem cells."

109.    Commercially manufactured skin substitutes (a) protect the integument from water loss and infection; (b) provide a stable, biodegradable scaffold to promote the synthesis of new dermal tissue; (c) allow host or other cells to proliferate within the

scaffold that will act as functional dermal cells rather than scar tissue; and (d) resist tearing forces while being easy to handle.

110.    It is further suggested that growth factors and extracellular matrix (ECM) components of the skin substitute (a) may promote cell proliferation; (b) reduce wound degradation caused by matrix metalloproteinase (MMP) within the wound; and (c) promote wound vascularization.

111.    Within the Technical Brief, several placenta-derived wound covering products with identical components as Procenta were identified as appropriate skin substitutes. It follows that Procenta, likewise, qualifies as a skin substitute and falls squarely within the purview of LCD L36377.

112.    FFLC has submitted uncontroverted evidence attesting that the use of Procenta to promote wound healing is consistent with the standards of care in the local medical community and that many other physicians in its local community also regularly utilize Procenta or other placenta-derived products for treatment of similar wound conditions.

113.    Each beneficiary's clinical records on file also establish that FFLC adhered with the applicable standard of care in utilizing Procenta as a skin substitute when more conservative treatments failed.

114.    It was improper and inappropriate for CMS, which lacks first-hand knowledge of the beneficiary's history and the applicable standard of care in the

medical community, to substitute its judgment for that of the treating physician's medical judgment.

115.    CMS's conclusion that FFLC's use of Procenta falls outside of the standard of care is purely speculative.

116.    Based on the beneficiary's diagnosis, history, representations, and treatment course, it was medically reasonable and necessary for FFLC to utilize Procenta as a skin substitute graft to promote wound healing.

117.    Given that Q4244 code was appropriately billed, the associating physician services code CPT 15271 must also be covered.[4]

### A.    Limitation of Liability Provisions

118.    Courts have emphasized whether providers knew of "widely-published" CMS materials governing Medicare coverage (*see MacKenzie Med. Supply, Inc. v. Leavitt*, 419 F. Supp. 2d 766, 774 (D. Md. 2006), aff'd, 506 F.3d 341 (4th Cir. 2007); *Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 119 (D. Mass. 2009)) and whether the provider has received "conflicting information" concerning coverage eligibility (*Yale-New Haven Hosp., Inc. v. Thompson*, 162 F. Supp. 2d 54, 68 (D. Conn. 2001)). The Code of Federal Regulations generally revolves around the acceptable standards of practice in the local medical community, and documents publicly promulgated by CMS about coverage. 42 C.F.R. § 411.406.

---

[4] The Council fails to address the arguments raised by the lower-level appeals that CPT 15271 "is incorrectly billed because it is not intended to be reported for application of a liquid or gel non-draft wound dressing." Setting aside the fact that Procenta is an allograft wound covering, and not a non-graft wound dressing, the Council's failure to address the issue constitutes a waiver.

119.    Furthermore, Medicare Claims Processing Manual, Chapter 30, entitled – Financial Liability Protections, provides that the Social Security Act "protect[s] beneficiaries, healthcare providers, and suppliers under certain circumstances from unexpected liability for charges associated with claims that Medicare does not pay." *See* Section 10.

120.    Specifically, Section 1879 of the Act allows for limitation of liability (LOL) where a provider of services did not know, and could not reasonably have been expected to know, that payment would not be made for such services.

121.    In accordance with regulations at 42 CFR 411.406, evidence that the healthcare provider did, in fact, know or should have known that Medicare would not pay for an item or service includes:

1.    A Medicare contractor's prior written notice to the provider of Medicare denial of payment for similar or reasonably comparable item or service. This also includes notification of Quality Improvement Organization (QIO) screening criteria specific to the condition of the beneficiary for whom the furnished item and/or service are at issue and of medical procedures subject to preadmission review by the QIO. Instructions for application of the LOL provision to QIO determinations are in the QIO Manual;

2.    Medicare's general notices to the medical community of Medicare payment denial of item or service under all or certain circumstances (such notices include, but are not limited to, manual instructions, bulletins, and Medicare contractors' written guidance);

28

3.    Provision of the item and service being inconsistent with acceptable standards of practice in the local medical community.

4.    Written notification from the healthcare provider's utilization review committee informing the healthcare provider or supplier that the item and/or service was not covered;

5.    The healthcare provider issuing a written notice of the likelihood of Medicare payment denial for an item and/or service to the beneficiary; or

6.    The healthcare provider or supplier being previously notified by telephone and/or in writing that an item or service is not covered or that coverage has ended.

122.    In this case, it is uncontroverted that none of the enumerated scenarios have occurred. There has not been any notification, written or otherwise, from the Medicare contractor concerning the payment eligibility on Procenta products. Furthermore, there has not been any previous claim denial for related services.

123.    On the contrary, once the first claim was denied, FFLC immediately ceased all operation relating to Procenta.

124.    Additionally, the Administrative Record will reflect that no advanced beneficiary notice of non-coverage (ABN)[5] was ever issued to the beneficiary in question.

125.    In fact, CMS has specifically issued LCD L36377 which affirmatively provides coverage for applications of Procenta and similar skin substitutes under similar circumstances.

---

[5] 42 C.F.R. 411.404(b) and (c), and 411.408(d)(2).

126.    As noted above, the FDA has already made an independent assessment on the safety and effectiveness of Procenta and has issued specific TRG guidance on its homologous use.

127.    In this respect, the ALJ and the Council have acknowledged that CMS has previously issued several administrative rulings upholding coverage on the use of placental skin substitutes.

128.    Clearly, the evidence reflects that FFLC had no actual knowledge and could not have foreseen CMS's eventual decision to deny coverage for Procenta.

129.    The LOL provision was enacted to alleviate provider liability of this nature. As such, the LOL provision applies here, and FFLC should not be held liable for the claim payment.

130.    Defendants' refusal to apply the LOL provision constitutes a gross misapplication of the law.

131.    Based on the foregoing, Defendants' Final Order denying coverage is not supported by substantial evidence, it constitutes a clear error of law, and it constitutes an arbitrary and capricious act.

## COUNT I
## JUDICIAL REVIEW OF AGENCY DECISION
## OMHA Appeal Case # 3-12532508877 (Docket # M-24-3000), Beneficiary G.M.

132.    The allegations contained in paragraph 1 through 131 of this Verified Complaint are incorporated by reference as if fully set out herein.

133.   FFLC seeks judicial review of the Secretary's denial of a claim for the administration of Procenta wound covering (CPT Q4244) and accompanying physician services (CPT 15271) furnished by FFLC to Beneficiary G.M. on November 3, 2022 (date of service).

134.   On November 3, 2022, the date of service, FFLC duly furnished the services and items to the beneficiary at issue and, thereafter, sought Medicare reimbursement. The Medicare Administrative Contractor, First Coast Service Options, Inc. ("FCSO") denied Medicare coverage.

135.   FFLC timely requested a redetermination for the denial, and FCSO once again declined coverage, concluding that Procenta did not meet the requirements for billing as a skin substitute graft.

136.   Thereafter, FFLC timely requested a reconsideration with the QIC, C2C Innovative Solutions, Inc. ("C2C"). C2C returned an unfavorable decision to FFLC and erroneously found that Procenta "is not approved by the FDA for this use … it has not been proven to be safe and effective in these circumstances; therefore, it is considered investigational and/or experimental." Notably, C2C did not address the applicability of LCD L36377, Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers.

137.   Subsequently, FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision and submitted a written position statement.

31

138.    On or about March 14, 2024, ALJ Judge Lewis Booker ("ALJ Booker") issued an unfavorable decision. A copy of the Decision is attached as **EXHIBIT B-1**.

139.    ALJ Booker improperly found that Procenta was not "furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition" and that it is "an investigational use." *See* **EXHIBIT B-1,** pgs. 3 and 4.

140.    ALJ Booker also wrongfully found that physician services code CPT 15721 "is not supported as no 'skin substitute graft' was actually applied." Additionally, he found that FFLC is not entitled to the limitation of liability provision because it "is presumed to have actual or at the very least constructive knowledge because of its receipt of CMS notices, or its knowledge of what are considered acceptable standards of practice by the local medical community." *See* **EXHIBIT B-1,** pg. 5.

141.    On May 8, 2024, FFLC requested a Medicare Appeals Council review of ALJ Booker's decision.

142.    On November 10, 2025, the Council issued an unfavorable decision. *See* **EXHIBIT A-1**. The Council's decision constitutes CMS' final agency order.

143.    Based on the foregoing, Defendants' final agency order and their decision to deny coverage, and not limit liability for the non-covered charges, are not supported by substantial evidence, constituting a clear error of law and an arbitrary and capricious act.

## COUNT II
## JUDICIAL REVIEW OF AGENCY DECISION
## OMHA Appeal Case 3-12656964257 (Docket # M-24-2873), Beneficiary L.E.

144.    The allegations contained in paragraph 1 through 131 of this Verified Complaint are incorporated by reference as if fully set out herein.

145.    FFLC seeks judicial review of the Secretary's denial of a claim for the administration of Procenta wound covering (CPT Q4244) and accompanying physician services (CPT 15271) furnished by FFLC to Beneficiary L.E. on November 14, 2022.

146.    On November 14, 2022, the date of service, FFLC duly furnished the services and items to the beneficiary at issue and, thereafter, sought Medicare reimbursement. FCSO denied Medicare coverage.

147.    FFLC timely requested a redetermination for the denial, and FCSO once again declined coverage, concluding that Procenta did not meet the requirements for billing as a skin substitute graft.

148.    Thereafter, FFLC timely requested a reconsideration with C2C. C2C returned an unfavorable decision to FFLC.

149.    Subsequently, FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision and submitted a written position statement.

150.    On or about March 8, 2024, ALJ Jonathan Eliot ("ALJ Eliot") issued an unfavorable decision. A copy of the Decision is attached as **EXHIBIT B-2**.

151.    ALJ Eliot found that Procenta was not "safe and effective and not experimental or investigational when used for wound treatment." *See* **EXHIBIT B-2**, pg. 6.

152.    Additionally, he found that FFLC is not entitled to the limitation of liability provision because it "must reasonably be expected to have known Medicare payment would not be made for the services given its constructive notice of Medicare statute, regulation, and CMS coverage policy." *See* **EXHIBIT B-2**, pg. 7.

153.    Thereafter, FFLC timely requested a Medicare Appeals Council review of ALJ Eliot's decision.

154.    On November 14, 2025, the Council issued an unfavorable decision. *See* **EXHIBIT A-2**. The Council's decision constitutes CMS' final agency order.

155.    Based on the foregoing, Defendants' final agency order and their decision to deny coverage, and not limit liability for the non-covered charges, are not supported by substantial evidence, constituting a clear error of law and an arbitrary and capricious act.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants for the following:

a)    An Order from this Court reversing the Secretary's final orders (**EXHIBITS A-1** and **A-2)**;

b)    An Order from this Court requiring CMS to reimburse Plaintiff for the claims at issue;

c)     In the alternative to limit Plaintiff's financial liability pursuant to § 1879 of the Social Security Act;

d)     Prejudgment and post-judgment interest;

e)     Reasonable attorney's fees and costs of suit; and

f)     Such other and further relief as the Court may deem just and proper under law.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: January 9, 2026                    Respectfully submitted,

                                          EDWARD L. LARSEN, ESQ., P.A.

                              By:     */s/ Edward L. Larsen*
                                      Edward L. Larsen, Esq.
                                      Counsel for Plaintiff
                                      Florida Bar No.: 16700
                                      The Chamber Building
                                      2390 Tamiami Trail N., Suite 202
                                      Naples, Florida 34103
                                      (239) 643-0100
                                      Ed@EdwardLarsenEsq.com

## VERIFICATION

STATE OF FLORIDA    )
COUNTY OF COLLIER)

      DR. KEVIN LAM, DPM, FACFAS, being duly sworn, deposes and says that I am the President of the Plaintiff, Family Foot & Leg Center, P.A., in the case captioned *Family Foot & Leg Center, P.A. v. Robert F. Kennedy, Jr., et al*, filed in the United States District Court for the Middle District of Florida, and have authorized the filing of this Amended Complaint. I have reviewed the allegations in the Amended Complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I relied on the Plaintiff's records pertaining to the billing of Medicare (CMS) for patients, and the information provided by the Defendant agencies, and I believe them to be true.

                        DR. KEVIN LAM, DPM, FACFAS

STATE OF FLORIDA    )
COUNTY OF COLLIER)

      The foregoing Verification was sworn to before me this 9 day of January 2026, by Dr. KEVIN LAM, who [ ] is personally known to me or [ ] has produced *Driver License* as identification.

[Notary Seal]

                Notary Public
                Printed Name:

                LAZARA SANZ

LAZARA SANZ
Notary Public - State of Florida
Commission # HH 294919
My Comm. Expires Nov 24, 2026
Bonded through National Notary Assn.