**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Number: M-24-3000
OMHA Appeal Number: 3-12532508877

Rivas Goldstein, LLP
Attn: Ethan Lau
3345 Bee Caves Rd., #104
Austin, TX 78746

NOTICE OF DECISION OF MEDICARE APPEALS COUNCIL

What This Notice Means

Enclosed is a copy of the decision of the Medicare Appeals Council. If you have any questions, you may contact the Centers for Medicare & Medicaid Services regional office or the local Medicare contractor.

Your Right to Court Review

If you desire court review of the Council's decision and the amount in controversy is $1,900 or more, you may commence a civil action by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business. *See* § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The complaint must be filed within sixty days after the date this letter is received. 42 C.F.R. § 405.1130. It will be presumed that this letter is received within five days after the date shown above unless a reasonable showing to the contrary is made. 42 C.F.R. § 405.1136(c)(2).

If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ

appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

This notice and enclosed order were mailed on November 10, 2025.

Enclosure

cc: Beneficiary
Family Foot and Leg Center
Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-24-3000**

Family Foot and Leg Center, Appellant
OMHA Appeal No. 3-12532508877

# DECISION

The Administrative Law Judge (ALJ) issued a decision dated March 14, 2024, concerning Medicare Part B coverage of Procenta, a placental derived allograft (Healthcare Common Procedure Coding System (HCPCS) Q4244), and a skin substitute graft (Current Procedural Code (CPT)15271), furnished by the appellant-supplier (appellant) to the beneficiary on November 3, 2022. The ALJ concluded that Medicare did not cover Procenta or application because they were not medically reasonable and necessary. The ALJ also held the appellant liable for the non-covered costs.

The appellant, through counsel, has filed a request for review, seeking Medicare Appeals Council (Council) review of the ALJ's action. The Council enters into the record the appellant's DAB-101 as Exhibit (Exh.) MAC-1 and the supporting brief as Exh. MAC-2. Along with the request for review, the appellant has submitted an affidavit. To the extent that this document is new evidence, the appellant provides no showing of good cause to admit it for the first time at the Council level; to the extent that this document is duplicative, there is no need to admit this additional copy as evidence. *See* 42 C.F.R. § 405.1122(c); Exh. MAC-2. As a result, we exclude this document from evidence but retain it in the record as Exh. MAC-3 (excluded).

The Council limits its review to the exceptions raised by the appellant in the request for review. 42 C.F.R. § 405.1112(c). The Council reviews the ALJ's action *de novo*. *Id.* §§ 405.1100, 405.1108.

For the reasons explained below, we adopt the ALJ's decision.

## DISCUSSION

At issue in this case is Medicare Part B coverage of Procenta, per 200 mg and a skin substitute graft furnished to the beneficiary on November 3, 2022, to treat traumatic ulceration. *See* Exh. MAC-2; Dec. at 1; File 3 at 3. On redetermination, the Medicare Administrative Contractor (Contractor) found that Procenta was used for a

non-homologous use and that there was no peer reviewed literature submitted supporting the use of human placental tissue in the treatment of wounds, rendering this use investigational and not covered. File 3 at 2-5. Regarding the skin substitute graft, the Contractor found that the HCPCS code billed (15271) was not applicable because the code was not meant to be billed for the application of non-graft wound dressings. *Id.* at 3-5. The Qualified Independent Contractor (QIC) upheld this denial on reconsideration, finding, like the Contractor, that Procenta was investigational and not proven to be safe and effective for the use in this case and that the code used for the skin substitute graft (CPT 15271), was incorrectly billed because it is not intended to be reported for application of a liquid or gel non-graft wound dressing. *See* File 2 at 5.

Following a hearing, the ALJ issued an unfavorable decision finding that the Procenta and application were not covered by Medicare Part B. *See* Dec. The ALJ, applying the factors in chapter 3 of the Medicare Program Integrity Manual (MPIM), found that the use of Procenta in this case was investigational and "not furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition." *Id.* at 4 (citing MPIM, Ch. 3, § 3.2.2.6). Further, the ALJ found that the use of code 15271 was not warranted because no skin substitute graft was applied in this case. *See id.* Accordingly, the ALJ found that the Procenta and skin substitute graft were not eligible for Medicare coverage. *See id.* All levels below held the supplier, not the beneficiary, liable for the non-covered costs under § 1879 of the Social Security Act (Act). *Id.* at 4-5; File 3 at 5-6; File 5 at 5.

Before the Council, the appellant contends that Procenta was used as a wound covering in this case, which "falls squarely within the prescribed use as a HCT/Ps[1] regulated under § 361 of the Public Health Service Act (PHS)." Exh. MAC-2 at 2. In addition, the appellant argues that use of Procenta in this case was medically reasonable and necessary under the MPIM factors, that it was furnished "consistent with the appliable standards of care," and that the appellant supplied sufficient medical literature to support the use in this case, which the ALJ improperly analyzed. *Id.* at 2–4. The appellant also argues that the ALJ improperly substituted his opinion for that of the treating physician, and further states that Procenta was furnished only after attempts to treat the beneficiary with conservative treatments were ineffective. *Id.* at 3-4. Moreover, the appellant argues that this case should have been evaluated under Local Coverage Determination (LCD) L36377, which pertains to skin substitutes, based on the appellant's reading of a Department of Health and Human Services document concerning the use of skin substitutes to treat chronic wounds. *Id.* at 3. Finally, the appellant contends that it should not be held liable under § 1879 of the Act because it did not have actual or constructive knowledge that the Procenta would not be covered by Medicare. *See id.* at 4-5.

---

[1] Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps)

Pursuant to § 1862(a)(1)(A) of the Act, Medicare covers only items and services that are medically reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the function of a malformed body member. As the party seeking payment, the appellant has the burden to demonstrate the services for which it seeks coverage are reasonable and necessary for the purposes provided. 42 C.F.R. § 424.5(a)(6).

Absent an applicable National Coverage Determination (NCD) or LCD, as is the case here, contractors and adjudicators must make individual reasonable and necessary determinations by assessing whether the service is safe and effective, not experimental or investigational, and appropriate. MPIM, CMS Pub. 100-08, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2 (Rev. 10365, Effective Aug. 27, 2020). Medicare defines “appropriate” to require, among other things, that the service must be furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary’s condition or to improve the function of a malformed body member; that it is a service that meets, but does not exceed, the beneficiary’s medical need; and that it is furnished in a setting appropriate to the beneficiary's medical needs and condition. *See id.* § 3.6.2.2.

The MPIM further states that, when developing an LCD, a Medicare Administrative Contractor (MAC) shall use evidence of “general acceptance by the medical community” including “published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines.” MPIM Ch. 13, § 13.5.3 (Rev. 863, Effective Oct. 3, 2018); *see also id.* § 13.2.3 (“[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community”). While these MPIM provisions constitute guidance for contractors assessing medical reasonableness and necessity and in conducting an evidentiary review during an LCD’s development, they necessarily apply to adjudicators, including ALJs and the Council, reviewing the contractor’s medical reasonableness and necessity determination in the absence of an applicable NCD or LCD. The manual provisions thus treat the underlying peer-reviewed medical literature as an inherent part of evaluating whether an item or service is reasonable and necessary, including whether it is safe, effective, appropriate, and not experimental or investigational. *See* MPIM Ch. 3, § 3.6.2.2; 42 C.F.R. § 405.1046(a) (noting that the ALJ’s decision should include “a summary of any clinical or scientific evidence used in making the determination”).

All statutes and regulations pertaining to the Medicare program are binding on ALJs and the Council. 42 C.F.R. § 405.1063(a). While not bound by the MPIM guidance, ALJs and the Council must give the MPIM substantial deference if it is applicable to a particular case. *Id.* § 405.1062(a). If an ALJ or the Council declines to follow MPIM guidance, the decision must explain the reasons why the ALJ or the Council departed from the MPIM, and it does not have precedential effect. *Id.* § 405.1062(b).

After careful review, we agree with the ALJ that the evidence in the record does not support that the use of Procenta was medically reasonable and necessary pursuant to the standards in the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2.

The appellant submitted several documents to support its contention that the Procenta application was medically reasonable and necessary in this case. The appellant provided the beneficiary's medical records, presentation slides related to amniotic fluid products, examples of QIC reconsideration decisions in other cases, a letter from the United States Food and Drug Administration's Tissue Reference Group, dated August 19, 2020, the HCPCS code application for Procenta, several medical literature articles, a case study, a book chapter, and the HCPCS level II code summary. *See* File 3 at 14-108; File 4 at 76. The journal articles and book chapter provided discuss overviews of wound healing processes and the role of extracellular matrices in those processes; extracellular matrix-based graft materials; and biomarkers associated with healing processes, and consist of the following:

- Peng-Hui Wang, et al., *Wound Healing*, 81 J. of the Chinese Medical Association 94-101 (2018)
- Linsey E. Lindley, et al., *Biology and Biomarkers for Wound Healing*, 138(3) Plastic Reconstruction Surgery 18S-28S (Sept. 2016)
- A chapter from an unknown volume by Jason P. Hodde and Michael C. Hiles entitled *The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling*
- Iveta Schmiedova, et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, Membranes (2021)
- Pawel Olczyk, et al., *The Role of the Extracellular Matrix Components in Cutaneous Wound Healing*, Biomed Research International (2014)

File 3 at 32-45, 56-107[2].

Without an applicable NCD or LCD, the MPIM clarifies that reasonableness and necessity depend on whether the treatment is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, § 3.6.2.2. In this case, the evidence provided contains descriptions of Procenta and its indications for use, but does not demonstrate that Procenta is effective under Medicare criteria for the treatment of the beneficiary's condition. *See, e.g.*, File 3 at 50-55, 108. Here, the medical record reflects that the beneficiary received Procenta via injection to treat "[d]ifficult traumatic

---

[2] We note that while some of the articles synthesize research from various studies, the complete texts of the underlying studies are not included in the record. Accordingly, the Council will evaluate the review and meta-analysis articles as presented but cannot consider the individual studies cited therein as independent evidence. If the appellant wished for the Council to evaluate those underlying studies separately from the reviews and meta-analyses in which they appear, full copies of those studies should have been submitted. *See* 42 C.F.R. § 424.5(a)(6).

ulceration." *Id.* at 17. Notably, none of the above articles evaluated the use of human placental-derived allografts for the treatment of the beneficiary's specific condition and, importantly, none of the studies involve or mention Procenta. *Id.* at 32-45, 56-107.

We disagree with the appellant's assertion that the record contains "a wealth of medical texts and clinical studies that attest to safety and effectiveness of placental derived skin substitute for treatment of wounds." *See* Exh. MAC-2 at 2-3. The record contains only four articles, and one book chapter provided by the appellant. File 3 at 32-45, 56-107. One of the articles discusses recent literature on wound healing, aspects related to excessive wound healing, and stem cell therapy and prevention strategy for excessive wound healing. *Id.* at 56-63. A second article discusses literature identifying biomarkers associated with normal and aberrant wound healing. *Id.* at 64-83. A third article provides an overview of the wound healing process, with particular focus on the role of extracellular matrix constituents. *Id.* at 99-107. The fourth article provides only a broad summary of case studies with a general claim of efficacy in the context of historical background and rationale for use of amniotic membrane derivatives in wound healing. *Id.* at 32-45. The book chapter in the record provides an explanation of the interplay of the extracellular matrix with the bodies' cells during one phase of the wound healing process called remodeling. *Id.* at 84-98. None of these documents discuss the use of Procenta, whether for use with neuropathic ulcerations, or for other symptoms or diagnoses.

In addition to the medical literature, the appellant provided several documents that appear to be PowerPoint slides or promotional materials containing basic information about Procenta, such as a description of Procenta, its capabilities and application. *Id.* at 52. The record also contains a case study of a single patient who received Procenta for a diabetic foot ulcer after other treatments failed to stall wound progression. *Id.* at 53-55. Notably, the HCPCS level II code application includes no information about treatment of musculoskeletal conditions but rather states that Procenta "is indicated to treat chronic non-healing wounds, such as venous stasis and diabetic foot ulcers for the purpose of providing an extracellular matrix (ECM) scaffold and soluble proteins to assist in the wound healing process." File 4 at 76; *see also* File 3 at 14-17 (documenting the beneficiary's musculoskeletal condition regarding "enthesopathy and pain upon the midfoot joint."

While these materials discuss Procenta, they are insufficient to meet the requirements outlined in the MPIM, which calls for "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." MPIM Ch. 13, § 13.5.3. Moreover, the record indicates that the appellant administered Procenta to treat the beneficiary's "traumatic ulceration" in their leg, which is not a clinically indicated condition according to the materials submitted by the appellant. File 3 at 17. None of the aforementioned

documents submitted by the appellant discuss the use of Procenta as being safe and effective. *See id.* at 32-45, 56-107.

Further, the record does not include sufficient evidence that Procenta is not "experimental or investigational," as defined in the MPIM. *See* MPIM Ch. 3, § 3.6.2.2. Rather, as noted above, none of the articles or other documents provided by the appellant involve the use of Procenta in a peer-reviewed study or other literature that would satisfy MPIM requirements. File 3 at 32-45, 56-107. Moreover, the articles that are in the record discuss various limitations that undermine the appellant's argument that the record shows Procenta was not experimental or investigational as used in this case. One article notes that it "only provides a basic understanding of pathogenesis about the wound healing" and that "[m]ore studies focusing on human wound healing are welcome." File 3 at 61. Another article mentions that many "promising biomarkers utilizing different avenues of sample collection are currently in development" and that further work will be "necessary for transition of this technology to clinically feasible point-of-case applications," implying that the wound healing technologies discussed in the article are not yet beyond the experimental and investigational stages. *Id.* at 64-65, 72. Another article notes that amniotic products have "potential," and that the "time of treatment and number of applications depends on the individual parameters of the wound and varies in the sources." *Id.* at 40. In addition, the articles and the book chapter in this record do not report studies, whether Procenta or other placental-tissue-derived allografts. *Id.* at 32-45, 56-107. Finally, the case study included in this record concerns one individual patient and therefore does not meet the MPIM requirements. *Id.* at 53-55.

In addition, we find that the record does not include evidence to support that Procenta was "appropriate" for the treatment of the beneficiary's condition, as defined in the MPIM. As discussed above, most of the record evidence provided does not document or recommend the use of Procenta specifically. *See* File 3 at 32-45, 56-107.

We acknowledge the appellant's argument that products like Procenta are consistent with acceptable standards of care and are regularly administered in the local community to treat similar conditions to that of the beneficiary. Exh. MAC-2 at 3-4. However, as noted above, the MPIM instructs that "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." MPIM, Ch. 13, § 13.2.3. Therefore, we find insufficient evidence that Procenta was "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition[.]" *See id.* §§ 13.2.3, 13.5.4; MPIM, Ch. 3, § 3.6.2.2.

The record does not demonstrate that Procenta is the standard of care for treatment of the beneficiary's condition, that it meets but does not exceed the beneficiary's medical need, and that it is at least as beneficial as existing and available medically appropriate

alternatives. *See id*. Consequently, the record does not demonstrate that Procenta was generally accepted by the medical community as "appropriate" for the beneficiary.

We have considered the appellant's remaining contentions, but they do not alter our conclusion that the record in this case fails to satisfy the MPIM guidance. As an initial matter, we highlight that, as it relates to our review under the MPIM criteria, Medicare regulations state that U.S. Food and Drug Administration (FDA) categorization is only "*a factor* in making Medicare coverage decisions." *See* 42 C.F.R. § 405.201(a)(1) (emphasis added); 78 Fed. Reg. 48164, 48165 (Aug. 7, 2013). Thus, we do not find that FDA categorization alone determines Medicare coverage. Medicare is administered by CMS, not the FDA. *See* 42 U.S.C. §§ 1395–1395lll. The evidence that is required to support a product's ability to be used and marketed is a separate question from whether it is safe and effective, not experimental or investigational, and appropriate for purposes of Medicare coverage. *See* 78 Fed. Reg. at 48165.

The appellant argues that the use of Procenta in this case "falls squarely within the prescribed use as an HCT/P regulated under § 361 of the Public Health Service (PHS) Act." *See* Exh. MAC-2 at 2. In support, the appellant has provided a letter from the FDA's Tissue Reference Group, which was sent to the appellant in response to a request for a recommendation for Procenta. File 3 at 50-51. This letter discusses different applications of Procenta, and whether those applications would qualify for regulation under § 361. *See id.* However, we reiterate that even if Procenta satisfies the PHS § 361 requirements, ALJs and the Council must still apply the medical reasonableness and necessity criteria outlined in the MPIM to the individual facts of this claim, as we have done above. *See* 42 C.F.R. § 405.201(a)(1); *see also id*. § 405.201(a)(2) ("CMS *may* consider for Medicare coverage [FDA approved devices] that have been categorized as . . . Nonexperimental/investigational") (emphasis added); *id*. § 405.1062(b) (requiring ALJs and the Council to provide an explanation if they decline to follow a coverage manual in a particular case). Accordingly, any contentions that Procenta does or does not meet the criteria for regulation under 21 C.F.R. § 1271.10(a) and § 351 or § 361 of the PHS Act are not determinative of Medicare coverage.

We acknowledge the appellant's argument that it is improper for the ALJ to substitute their own judgment for that of the beneficiary's physician, who provided evidence that the use of Procenta is consistent with the standards of care in the local community. *See* Exh. MAC-1 at 3-4. However, as noted above, the MPIM instructs that "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." MPIM, Ch. 13, § 13.2.3. In addition, ALJs and the Council must give the MPIM substantial deference if it is applicable to a particular case, and as previously discussed, the applicable coverage criteria have not been met in this case. 42 C.F.R. § 405.1062(a). We also acknowledge that the appellant has provided several QIC reconsideration decisions in other cases, however, contractor decisions are not precedential, and ALJs

and the Council must conduct *de novo* reviews of the records in each case. *Id.* §§ 405.1062, 405.1063, 405.1100. As a result, these decisions are of limited probative value.

The appellant also argues that LCD L36377 should apply to this case because Procenta should qualify as a skin substitute within its purview. Exh. MAC-2 at 3 (citing to a technical brief published by the Department of Health and Human Services' Administration for Healthcare Research and Quality). However, we find that the record does not establish that LCD L36377, titled, "Application of Skin Substitute Grafts for Treatment of DFU [diabetic foot ulcers] and VLU [venous leg ulcers] of Lower Extremities," applies to this case. LCD L36377 (Effective January 8, 2019). In particular, LCD L36377 states that skin substitute graft procedures "are not to be reported for application of non-graft wound dressings (e.g., gel, ointment, foam, liquid) or injected skin substitutes." *Id.*; *see also* Billing and Coding Article A57680 (Effective August 13, 2020).

The medical record in this case refers to the procedure involved as an "application of amniotic membrane/injection graft application to the foot" that was "applied via the usual steps and protocols." File 3 at 14. This description is ambiguous as to how Procenta was administered and seems to indicate that Procenta was administered via injection, which would preclude reporting the procedure in this case as a skin substitute graft procedure or analyzing coverage under LCD L36377. *Id.*; LCD L36377. Because the language in the record is ambiguous as to how Procenta was administered, the Council cannot find that LCD L36377 is applicable.

For the reasons discussed above, we conclude that Medicare does not cover the Procenta furnished to the beneficiary on November 3, 2022. Additionally, because CPT 15271 was billed in conjunction with the administration of Procenta, the Council finds that CPT 15271 is not covered under Medicare Part B in this case. *See* Medicare Benefit Policy Manual (MBPM), CMS Pub 100-02, Ch. 16, § 180 (explaining that services related to non-covered services are not covered services under Medicare.)

Turning to liability, under § 1879 of the Act, Medicare may limit the liability of a beneficiary or supplier (or both) for the non-covered costs of services where the coverage denial was based on a finding that the services were not medically reasonable and necessary pursuant to § 1862(a)(1)(A) of the Act. Section 1879 further provides that the limitation on liability applies when a beneficiary or supplier did not know, and could not reasonably have been expected to know, that the items were not covered by Medicare.

Notably, the regulations stipulate that a supplier could have been expected to know that a service was excluded from coverage based on "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or [quality improvement organizations]" or "[i]ts knowledge of what are

considered acceptable standards of practice by the local medical community." 42 C.F.R. §§ 411.406(e)(1), (3). CMS manuals also provide that "[w]hen an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied." Medicare Claims Processing Manual (MCPM), CMS Pub. 100-04, Ch. 30, § 30.2.3. In turn, MCPM guidance establishes that acceptable standards of practice within the local community are based upon the existence of published medical literature, a consensus of expert medical opinions, and consultation with medical staff, medical associations, including local medical societies, and other health experts. *Id.*

The appellant has not raised any contentions regarding the ALJ's conclusion that the beneficiary in this case is not liable for any non-covered costs. *See* Exh. MAC-2; Dec. at 4. Accordingly, the Council summarily adopts the ALJ's finding that the beneficiary is not liable. 42 C.F.R. § 405.1112(c).

The appellant contends that its liability should be limited because it had neither actual nor constructive knowledge that the Procenta injection at issue would not be covered by Medicare. *See* Exh. MAC-2 at 4-5. In particular, the appellant contends that it found no publications by CMS or the MAC concerning coverage eligibility of Procenta, and that the MAC issued payments to the appellant for "similar claims" over approximately 12 months, including in claims where the appellant submitted clinical records to the MAC in response to prepayment Additional Documentation Review requests. *Id.* Further, the appellant contends that none of the circumstances enumerated under 42 C.F.R. § 411.406[3] that establish when a supplier knew or should have known that services would not be covered applies here. *See id.*

First, to the extent that Medicare has previously covered Procenta injections for the appellant or other suppliers, prior coverage is not determinative. Instead, each claim is considered individually, based on the record developed for that specific claim, and ALJs and the Council review the issues before them *de novo*. 82 Fed. Reg. 4974, 4979 (Jan. 17, 2017); 42 C.F.R. §§ 405.1100, 405.1108. We emphasize that prior contractor decisions are not precedential, and contractors also have authority to reopen previously paid claims and assess overpayments. *See* 42 C.F.R. § 405.980. Moreover, the Medicare program does not apply principles of equity or estoppel to coverage determinations and, thus, we find that prior coverage was not a reasonable basis for the appellant to believe that the services would be covered by Medicare.

---

[3] We note that the appellant's brief cited to 42 C.F.R. § 411.404, which sets forth criteria for determining beneficiary liability. *See* Exh. MAC-2 at 5. However, after careful review of the record we find that this is a citation error, and we proceed with a review of the appellant's liability based on § 411.406, which addresses the criteria for determining when a provider, practitioner, or other supplier knew that services would be excluded from coverage, as well as other applicable authorities. As noted above, the lower levels of review have already found that the beneficiary is not liable, and the appellant does not challenge these determinations.

We acknowledge the appellant's assertions that it based its assumptions on representations by the distributor and finding no transmittals or guidance by Medicare or CMS specifically concerning the coverage eligibility of Procenta. *See* Exh. MAC-2 at 4. Importantly, however, the appellant bears the burden of providing sufficient information to establish that the service at issue is covered and the amount of payment due. Act § 1833(e); 42 C.F.R. § 424.5(a)(6). Considering that burden, as well as the fact that Medicare is a defined benefits program, a supplier's liability is not limited simply because there is no explicit provision stating the specific service in question was not covered.

Relevant here, there are MPIM provisions that dictate the criteria for assessing coverage when there is no other guidance specifically concerning a service, and the appellant should have known that those criteria were not satisfied. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2 (explaining that such determinations are made by assessing whether the item or service is safe and effective, not experimental or investigational, and appropriate); MPIM, Ch. 13, §§ 13.5.4 (defining "appropriate" in the relevant context), 13.5.3 (identifying the evidence considered when determining coverage), 13.2.3 (clarifying that acceptance by an individual provider or a limited group of providers does not indicate general acceptance by the medical community). Therefore, the appellant could have been reasonably expected to know that the Procenta injection was not medically reasonable and necessary in light of its participation in the Medicare program and access to coverage guidelines explaining the coverage requirements. *See* 42 C.F.R. § 411.406; *see also* CMS (formerly Health Care Financing Administration) Ruling 95-1 (Dec. 22, 1995); MCPM, Ch. 30, §§ 30.2.1-30.2.3.

As discussed above, the medical literature provided by the appellant indicates that this is an emerging field of medical science in which additional research is required. *See* File 3 at 32-45, 53-107. The appellant has not provided medical literature, statements by professional societies, or other evidence that establishes that Procenta is safe and effective, not experimental or investigational, and appropriate for the treatment of the beneficiary's condition. *See generally* Record; *see also* MPIM, Ch. 3, § 3.6.2.2. Therefore, the appellant could reasonably have been expected to know that Medicare would not cover the injection at issue such that its liability is not limited under § 1879 of the Act. Accordingly, we find that the appellant is liable for the non-covered charges.

(Continued on next page.)

DECISION

The Council adopts the ALJ's decision. Medicare does not cover Procenta (HCPCS code Q4244), or the services billed under CPT 15271 furnished to the beneficiary on November 3, 2022. The appellant remains liable for the non-covered charges.

**MEDICARE APPEALS COUNCIL**

Kanisha L. Adkins
Administrative Appeals Judge

Cherise V. Neville
Administrative Appeals Judge

Date: November 10, 2025