**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Number: M-24-2873
OMHA Appeal Number: 3-12656964257

Rivas Goldstein, LLP
Attn: Ethan Lau
3345 Bee Caves Rd. #104
Austin, TX 78746

NOTICE OF DECISION OF MEDICARE APPEALS COUNCIL

What This Notice Means

Enclosed is a copy of the decision of the Medicare Appeals Council. If you have any questions, you may contact the Centers for Medicare & Medicaid Services regional office or the local Medicare contractor.

Your Right to Court Review

If you desire court review of the Council's decision and the amount in controversy is $1,900 or more, you may commence a civil action by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business. *See* § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The complaint must be filed within sixty days after the date this letter is received. 42 C.F.R. § 405.1130. It will be presumed that this letter is received within five days after the date shown above unless a reasonable showing to the contrary is made. 42 C.F.R. § 405.1136(c)(2).

If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ

appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

This notice and enclosed order were mailed on November 14, 2025.

Enclosure

cc: Beneficiary
Family Foot and Leg Center
Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-24-2873**

Family Foot And Leg Center, Appellant
OMHA Appeal No. 3-12656964257

# DECISION

The Administrative Law Judge (ALJ) issued a decision dated March 8, 2024, concerning Medicare Part B coverage of Procenta, a placental-derived allograft (Healthcare Common Procedure Coding System (HCPCS) Q4244), and a skin substitute graft (Current Procedural Terminology (CPT) 15271), furnished by the appellant-supplier (appellant) to the beneficiary on November 14, 2022. The ALJ concluded that Medicare did not cover Procenta or the procedure because they were not medically reasonable and necessary. The ALJ also held the appellant liable for the non-covered costs.

The appellant, through an appointed representative, has filed a request for review, seeking Medicare Appeals Council (Council) review of the ALJ's action. The Council enters into the record the appellant's request for review (Form DAB-101) as Exhibit (Exh.) MAC-1 and the supporting brief as Exh. MAC-2. With the request for review, the appellant has submitted an affidavit. To the extent that this document is new evidence, the appellant provides no showing of good cause to admit it for the first time at the Council level; to the extent that this document is duplicative, there is no need to admit this additional copy as evidence. *See* 42 C.F.R. § 405.1122(c). As a result, we exclude this document from evidence but retain it in the record as Exh. MAC-3 (excluded).

The Council reviews the ALJ's action *de novo* but limits its review to the exceptions raised by the appellant in the request for review. 42 C.F.R. §§ 405.1100, 405.1108, 405.1112(c).

For the reasons explained below, we agree with the ALJ that Medicare does not cover Procenta and that the appellant is liable for the non-covered costs; however, we modify the ALJ's decision to clarify the basis for denial.

## DISCUSSION

At issue in this case is Medicare Part B coverage of Procenta, per 200 mg and a skin substitute graft furnished to the beneficiary on November 14, 2022, to treat "[d]ifficult

[t]raumatic ulceration," of left lower extremity. File 11 at 7–11. On redetermination, the Medicare Administrative Contractor (MAC) found that Procenta was furnished for a non-homologous use and that there was no peer-reviewed literature submitted supporting the use of human placental tissue in the treatment of wounds, rendering this use investigational and not covered. *Id.* at 175. Regarding the skin substitute graft, the MAC found that the CPT was not applicable because the code was not meant to be billed for the application of non-graft wound dressings. *Id.* at 174. The Qualified Independent Contractor (QIC) upheld this denial on reconsideration, finding, like the MAC, that Procenta was investigational/experimental and not proven to be safe and effective for the use in this case, and CPT 15271 was incorrectly billed because it is not intended to be reported for application of a liquid or gel non-graft wound dressing. File 8 at 5.

The ALJ issued an on-the-record decision and determined that Medicare Part B did not cover Procenta in this case. The ALJ highlighted that there is no applicable National Coverage Determination (NCD) or Local Coverage Determination (LCD) addressing skin substitutes because Procenta's use for chronic wound care conflicted with U.S. Federal Drug Administration (FDA) assessments. Decision (Dec.) at 4. The ALJ further found that the FDA Tissue Reference Group (TRG) concluded chronic wound treatment falls outside Procenta's homologous use, rendering the application experimental, investigational, and not safe or effective. *Id.* at 4–5. Recognizing that FDA categorization is a factor in the analysis, but not a dispositive one, the ALJ explained that other evidence submitted by the appellant—including peer-reviewed literature and a technical brief—was afforded little weight because such material did not directly evaluate Procenta, was limited in scope, or lacked randomized clinical trials. *Id.* at 5–6. The ALJ also found that favorable QIC decisions and a Contractor email were nonbinding and without evidentiary weight. *Id.* at 6. Based on the totality of the record, the ALJ concluded that the claim did not meet the coverage criteria set forth in Medicare Program Integrity Manual (MPIM) Ch. 3, § 3.6.2.2 and held the appellant financially liable for the noncovered costs under § 1879 of the Social Security Act (Act). *Id.* at 6–7.

Before the Council, the appellant contends that the ALJ erred in finding Procenta was not medically reasonable or necessary. Exh. MAC-2. The appellant explains that the FDA TRG expressly authorized Procenta as a wound covering, to serve as a cover, offer protection, or retain fluid, and that the record established it was used on the beneficiary in this manner. *Id.* at 2. The appellant asserts that the ALJ mischaracterized the treatment as "chronic wound treatment" rather than "wound covering," which improperly excluded Procenta from the § 361 exemption. *Id.* at 2–3. The appellant further argues that excluding Procenta from chronic wound use defies medical understanding, since wound covering performs the same protective function whether used for acute or chronic wounds. *Id.* at 3. The appellant notes that under the ALJ's interpretation no placental skin substitute could ever be used for diabetic foot ulcers or venous leg ulcers, rendering LCD L36377 meaningless. *Id.*

The appellant highlighted that the Centers for Medicare & Medicaid Services (CMS) and the Council have recognized Procenta as clinically indicated for chronic, non-healing wounds, and thus its use is not in conflict with FDA assessments. *Id.* The appellant also argues that the ALJ improperly dismissed relevant medical literature because he did not name Procenta specifically, even though he addressed placental-derived products that are materially identical. *Id.* at 4. The appellant explains that Procenta is minimally manipulated, consistent with standards of care and technical briefs describing appropriate skin substitutes and regularly used by physicians for wound care when conservative treatments fail. *Id.* at 4–5. Finally, the appellant asserts that the ALJ erred in finding the appellant liable for the non-covered costs, emphasizing that under § 1879 of the Act, the appellant could not reasonably have known Medicare would deny coverage given reliance on prior claim approvals and Contractor communications. *Id.* at 5–6.[1]

Pursuant to § 1862(a)(1)(A) of the Act, Medicare covers only items and services that are medically reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the function of a malformed body member. As the party seeking payment, the appellant has the burden to demonstrate the services for which it seeks coverage are reasonable and necessary for the purposes provided. 42 C.F.R. § 424.5(a)(6).

Absent an applicable NCD or LCD, as we discuss below, Contractors and adjudicators must make individual reasonable and necessary determinations by assessing whether the service is safe and effective, not experimental or investigational, and appropriate. MPIM, CMS Pub. 100-08, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2 (Rev. 10365, Effective Aug. 27, 2020). Medicare defines "appropriate" to require, among other things, that the service must be furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member; that it is a service that meets, but does not exceed, the beneficiary's medical need; and that it is furnished in a setting appropriate to the beneficiary's medical needs and condition. *See id.* § 3.6.2.2.

The MPIM further states that, when developing an LCD, a Contractor shall use evidence of "general acceptance by the medical community" including "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." MPIM, Ch. 13, § 13.5.3 (Rev. 863, Effective Oct. 3, 2018); *see also id.* § 13.2.3 ("[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community"). While MPIM Ch. 13 provides guidance for contractors in developing LCDs, it is appropriate to consider its examples of acceptable evidence because the development of LCDs fundamentally involves making a determination of medical reasonableness and necessity, as we are

---

[1] The appellant additionally states that it "cannot be found liable for the alleged overpayment." Exh. MAC-2 at 6. However, the claim at issue was initially denied by the MAC and an overpayment was not assessed against the appellant in this case. *See* File 8 at 5; File 11 at 95–96.

asked to do here in the absence of an applicable coverage policy. *See* MPIM, Ch. 13, § 13.5.3.

Importantly, in making coverage determinations, CMS has historically interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental, based on "acceptable clinical evidence" and "authoritative evidence." *See* 52 Fed. Reg. 15560 (Apr. 29, 1987); 54 Fed. Reg. 4304 (Jan. 30, 1989); *see also* MPIM, Ch. 13, § 13.7.1 (Rev. 473, Effective Jan. 15, 2013) (citing the need for the "strongest evidence available" to support a contractor's coverage determination). Moreover, in the context of reviewing individual coverage determinations, the regulations specifically contemplate consideration of scientific evidence. *See* 42 C.F.R. § 405.1046(a). Thus, the Medicare policies consider the underlying evidence as an inherent part of evaluating whether an item or service is reasonable and necessary, including whether it is safe, effective, appropriate, and experimental or investigational. We do not find that it would be consistent with Medicare policy for us (nor the ALJ) to find an item or service medically reasonable and necessary in the absence of a coverage policy without considering such evidence or relying only on testimony. We do find that reliance on Chapter 13 of the MPIM is part of an established framework for assessing medical reasonableness and necessity.

All statutes and regulations pertaining to the Medicare program are binding on ALJs and the Council. 42 C.F.R. § 405.1063(a). While not bound by the MPIM guidance, ALJs and the Council must give the MPIM substantial deference if it is applicable to a particular case. *Id.* § 405.1062(a). If an ALJ or the Council declines to follow MPIM guidance, the decision must explain the reasons why the ALJ or the Council departed from the MPIM, and it does not have precedential effect. *Id.* § 405.1062(b).

After careful review, we agree with the ALJ that the evidence in the record does not support that the use of Procenta was medically reasonable and necessary pursuant to the standards in the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.2.3, 13.5.3–13.5.4. However, we modify the ALJ's decision to clarify why LCD L36377 does not apply in this case.

The appellant submitted several documents to support its contention that the Procenta application was medically reasonable and necessary in this case. The appellant provided the beneficiary's medical records; manufacturer-generated information regarding Procenta; examples of QIC reconsideration decisions in other cases; a letter from the FDA Tissue Reference Group (TRG), dated August 19, 2020; a technical brief from the Agency for Healthcare Research and Quality (AHRQ); an email from a MAC regarding HCPCS Q4244; a patent application publication; a HCPCS Code Application Summary and CMS Decision for Procenta; and medical literature. File 1 at 8; File 4 at 2–176; File 10 at 2–27, 30–34, 90, 94–118; File 11 at 7–23, 25–54, 56–78, 81–170. The medical literature provided consisted of the following:

- Thomas E. Serena, M.D., et al., *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Huma Amniotic Membrane in the Treatment of Venous Leg Ulcers*; PRS Journal; File 11 at 15–23;
- Ronald L. Dirlam, DPM, *Use of Novel Placental-derived, Conformable Allograft in the Treatment of Non-Healing Chronic Wounds*; *Id.* at 25–27;
- A chapter from an unknown volume by Jason P. Hodde and Michael C. Hiles entitled *The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling*; *Id.* at 56–70;
- Linsey E. Lindley, PhD, et al., *Biology and Biomarkers for Wound Healing*, 138(3) Plastic Reconstruction Surgery 18S-28S (Sept. 2016); *Id.* at 36–54;
- Pawel Olczyk, et al., *The Role of the Extracellular Matrix Components in Cutaneous Wound Healing*, Biomed Research International (2014); *Id.* at 71–78;
- Iveta Schmiedova, et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, Membranes (2021); *Id.* at 81–94;
- Peng-Hui Wang, et al., *Wound Healing*, 81 J. of the Chinese Medical Association 94 (2018). *Id.* at 28–35;
- Charles M. Bowen, et al., *Cell-Free Amniotic Fluid and Regenerative Medicine: Current Applications and Future Opportunties.*Biomedicines 2022; *Id.* at 95–112;
- Motaharesadat Hosseini, et al., *Convergence of Biofabrication Technologies and Cell Therapies for Wound Healing*, 14 Pharmaceutics 2749 (Dec. 8, 2022); *Id.* at 113–140;
- Bin Wang, et al., *Functional Acellular Matrix for Tissue Repair,* 18 Materials Today Bio (2023); *Id.* at 141–170;

File 11 at 15–23, 25–54, 56–78, 81–170.[2,3]

First, we disagree with the appellant that LCD L36377 applies to this case, and that the ALJ's reasoning implicitly nullified the LCD. Exh. MAC-2 at 3–4. We find that the record does not establish that LCD L36377, titled, "Application of Skin Substitute Grafts for Treatment of DFU [diabetic foot ulcers] and VLU [venous leg ulcers] of Lower Extremities," applies to this case. LCD L36377 (Effective Jan. 8, 2019). In particular, LCD L36377 states that skin substitute graft procedures "are not to be reported for application of non-graft wound dressings (e.g., gel, ointment, foam, liquid) or injected

---

[2] Some of the provided research articles do not provide sufficient information to accurately cite, including journal volume numbers or publishing dates. However, as the literature is provided in its entirety we proceed with review of the articles and cite to them given the information that appears in the record.

[3] We note that while some of the articles synthesize research from various studies, the complete texts of the underlying studies are not included in the record. Accordingly, the Council will evaluate the review and meta-analysis articles as presented but cannot consider the individual studies cited therein as independent evidence. If the appellant wished for the Council to evaluate those underlying studies separately from the reviews and meta-analyses in which they appear, full copies of those studies should have been submitted. *See* 42 C.F.R. § 424.5(a)(6).

skin substitutes." *Id.*; *see also* Billing and Coding Article A57680 (Effective Aug. 13, 2020).

Here, the medical record in this case refers to the procedure involved as both an "injection" and a "graft application." File 11 at 9. Specifically, the physician describes the procedure as an "application of amniotic membrane/*injection graft application* to the wound" that was "applied via the usual steps and protocols." *Id.* at 9–10 (emphasis added). This description is unclear as to whether Procenta was administered via an injection or a graft application. If the Procenta was administered by an injection, it would preclude reporting the procedure in this case as a skin substitute graft procedure or analyzing coverage under LCD L36377. *See* LCD L36377.

Furthermore, we have not found any other evidence in the record to definitively support whether the procedure at issue here was an injection or a skin graft. The HCPCS code application notes that Procenta is packaged in a vial but does not state the manner of application (via injection or otherwise). File 10 at 118. Similarly, the letter from the FDA TRG does not discuss the manner of application (via injection or otherwise) of Procenta for wound applications, or otherwise. *Id.* at 32–33. Further, given that Procenta is packaged in a vial, it is unclear whether it is a gel or liquid wound dressing, which would also preclude application of LCD L36377. LCD L36377. Nor do we consider a prior Council decision that is not precedential, as the appellant would have us do, which recognized the manufacturer's stated indication for Procenta and nothing more. Exh. MAC-2 at 3 (citing Council decision in Docket No. M-24-1562). In sum, the record evidence in this case is insufficient to demonstrate that LCD L36377 applies to the procedure in this case, and we therefore disagree with the appellant's argument that it should have been used to analyze coverage here.

Second, as it relates to our review under the applicable MPIM guidance, Medicare regulations state that FDA categorization is only "*a factor* in making Medicare coverage decisions." *See* 42 C.F.R. § 405.201(a)(1) (emphasis added); 78 Fed. Reg. 48164, 48165 (Aug. 7, 2013). Thus, we do not find that FDA categorization alone or how a product has been used determines Medicare coverage. Indeed, we highlight that Medicare is administered not by the FDA, but by CMS. *See* 42 U.S.C. §§ 1395–1395lll. What evidence is required (or not required) to support a product's ability to be used and marketed is a separate question from whether it is safe and effective, not experimental or investigational, and appropriate for purposes of Medicare coverage. *See* 78 Fed. Reg. at 48165.

As such, we are not persuaded that coverage is appropriate based on the appellant's contention that Procenta "falls squarely within the prescribed use as an HCT/Ps [(human cells, tissues, and cellular and tissue-based products)] regulated under § 361 of the Public Health Service (PHS) Act." Exh. MAC-2 at 2–3. In support, the appellant has provided a letter from the FDA TRG, which was sent to the appellant in response to a request for a

recommendation for Procenta. File 10 at 32–33. This letter discusses different applications of Procenta, and whether those applications would qualify for regulation under § 361. *See id.* However, we reiterate that even if Procenta satisfies § 361 requirements of the PHS Act, ALJs and the Council must still apply the medical reasonableness and necessity criteria outlined in the MPIM to the individual facts of this claim, as detailed below. *See* 42 C.F.R. § 405.201(a)(1); *see also id.* § 405.201(a)(2) ("CMS *may* consider for Medicare coverage [FDA approved devices] that have been categorized as . . . Nonexperimental/investigational") (emphasis added); *id.* § 405.1062(a)(2) (requiring ALJs and the Council to provide an explanation if they decline to follow a coverage manual in a particular case). Accordingly, any contentions or determination that Procenta met the criteria for regulation under 21 C.F.R. Part 1271 and § 361 of the PHS Act are unpersuasive, as this is not determinative of Medicare coverage.

Thus, without an applicable NCD or LCD, the MPIM clarifies that reasonableness and necessity depends on whether the treatment is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, § 3.6.2.2. In this case, the evidence provided contains descriptions of Procenta and manufacturer-deemed indications for use but does not demonstrate that Procenta is safe and effective under Medicare criteria for the treatment of the beneficiary's condition. *See, e.g.*, File 10 at 34. Here, the medical record reflects that the beneficiary received Procenta via "application of amniotic membrane/injection graft application" to treat "[d]ifficult [t]raumatic ulceration" of the left lower extremity. *Id.* at 7–11.

We disagree with the appellant that the record contains "sufficient independent studies attesting to the safety and efficacy of placental derived membrane (such as Procenta) as a skin substitute for treatment of a variety of wounds." Exh. MAC-2 at 3. Of the ten pieces of medical literature, most of the research articles do not involve or discuss Procenta, nor do they evaluate the clinical use of an amniotic product for lower extremity ulcers, like the beneficiary's condition here. File 11 at 25–54, 56–78, 81–170. We cannot assume that studies of different products support the use of Procenta.

Specifically, the *Use of Novel Placental-derived, Conformable Allograft in the Treatment of Non-Healing Chronic Wounds* is the only article submitted that involves patients with lower extremity ulcers and who were treated with Procenta. *Id.* at 25–27. However, it involves a single case study of a patient with diabetic foot ulcer that was treated with Procenta, and it is not clear whether this single case study should be extrapolated to other patients. Further, it cannot be confirmed whether this research article was published in a peer-reviewed medical journal. *See id.* The absence of verifiable peer-review and publication status is insufficient to meet the evidentiary standard set forth in MPIM, Ch. 3, § 3.6.2.2 and MPIM, Ch. 13, § 13.5.3 and is therefore insufficient to support safety and effectiveness of Procenta to treat the type of wound at issue here. *See id.*

The *Wound Healing* review article summarizes the physiological and pathological processes of wound healing, and stem cell therapy and prevention strategy for excessive wound healing. *Id.* at 28–35. The *Biology and Biomarkers for Wound Healing* article discusses literature identifying biomarkers associated with normal and aberrant wound healing. *Id.* at 36–54. *The Role of the Extracellular Matrix Components in Cutaneous Wound Healing* article provides an overview of the wound healing process, with particular focus on the role of extracellular matrix constituents. *Id.* at 71–78. The book chapter, *The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling*, provides an explanation of the interplay of the extracellular matrix with the bodies' cells during one phase of the wound healing process called remodeling. *Id.* at 56–70. The *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds* article provides only a broad summary of case studies with a general claim of efficacy in the context of historical background and rationale for use of amniotic membrane derivatives in wound healing. *Id.* at 81–94. The article, however, provides little detail about the circumstances of studies, particular products, methods used, comparison to accepted treatments, or safety data. *Id.* Both *Convergence of Biofabrication Technologies and Cell Therapies for Wound Healing* and *Functional Acellular Matrix for Tissue Repair* discuss the technical aspects of mechanisms or materials related to placental products, but do not offer any insight on the safety and effectiveness of Proctena to treat the beneficiary's medical condition. *Id.* at 113–140 (synopsizing developments in biofabrication technology in creating material-based matrices for wound therapy), *Id.* at 141–170 (discussing the use of extracellular matrices for tissue engineering and repair). None of these articles discuss the use of Procenta, whether for use with leg ulceration, or for other symptoms or diagnoses.

The record also includes a technical brief from the AHRQ titled *Skin Substitutes for Treating Chronic Wounds*. File 4 at 2–176. In the brief, AHRQ identified 76 commercially available skin substitutes, most of which are acellular dermal products derived from human placental membrane, animal tissue, or donated human dermis. *Id.* at 4. We note that Procenta was not included in this brief. *Id.* at 22–26. The brief examined studies on approximately 25 skin substitutes assessing their use in chronic wounds like diabetic foot ulcers, venous leg ulcers, and pressure ulcers. *Id.* at 4, 10. These trials mainly tracked wound closure rates but lacked data on key outcomes such as wound recurrence, pain, function, and quality of life. *Id.* Consequently, AHRQ concluded that evidence regarding skin substitutes is limited, and emphasized the need for better-designed, longer-term studies to truly assess their effectiveness. *Id.*

Further, the record does not include sufficient evidence that Procenta is not "experimental or investigational," as defined in the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2. Rather, as discussed above, of the ten pieces of medical literature, only one article involves the use of Procenta in their respective study. File 11 at 25–27. However, that article lacks verifiable peer-review and publication status and is therefore insufficient to meet the evidentiary standard set forth in MPIM, Ch. 3, § 3.6.2.2 and MPIM, Ch. 13, § 13.5.3. *Id.*

The remaining articles, including the technical brief, consistently reference the investigational nature of the respective studies or recommend that more research is required to draw more definitive conclusions or to extrapolate the results beyond their particular study parameters. *See* File 4 at 10 ("The lack of studies examining the efficacy of most skin substitute products and the need for better-designed and -reported studies providing more clinically relevant data in this field are this Technical Brief's clearest implications."); *id.* at 68–69 (concluding future studies should employ standardized methods, include at least 12 weeks of treatment with follow-up for recurrence, and importantly, ensure blinded randomized allocation and blinded assessment of wound healing to minimize bias); File 11 at 81–82 (noting that amniotic membrane grafts have "potential" for chronic wound healing and that the time of treatment and number of applications depends on the individual parameters of the wound and varies in the sources); *id.* at 25–27 (lacking verifiable peer-review and publication status but concluding that Procenta was promising in a single patient); *id.* at 33 (concluding the review article "only provides a basic understanding of pathogenesis about the wound healing" and "[m]ore studies focusing on human wound healing are welcome"); *id.* at 36, 54 (concluding "[b]iomarkers may help identify and stratify subsets of non-healing patients for whom biomarker-guided approaches may aid healing" and there are "promising biomarkers utilizing different avenues of sample collection are currently in development"); *id.* at 56–70 (explaining that the processing of the product plays a major role in its effectiveness, and generally noting favorable and less favorable outcomes of studies evaluating functional tissue remodeling using extracellular matrix biomaterials); *id.* at 71–78 (discussing the role of extracellular matrix components in cutaneous wound healing but not presenting data from a patient cohort or clinical study).

In addition, we find that the record does not include evidence to support that Procenta was "appropriate" for the treatment of the beneficiary's condition, as defined in the MPIM. As discussed above, most of the record evidence provided does not document or recommend the use of Procenta specifically. *See* File 4 at 2–176; File 10 at 2–13, 28–31, 94–117; File 11 at 7–14, 15–24, 28–170.

We acknowledge the appellant's argument that it "submitted evidence indicating that other physicians in its local community also regularly utilize Procenta or other placenta-derived products for treatment of similar wound conditions." Exh. MAC-2 at 4–5. However, beyond the medical literature and AHRQ brief, we find no evidence in the record that physicians in the appellant's local community are regularly utilizing such products as Procenta. *See generally* Record.

Even still, as noted above, the MPIM instructs that "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." MPIM, Ch. 13, § 13.2.3. Therefore, we find insufficient evidence that Procenta was "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the

beneficiary's condition[.]" MPIM, Ch. 3, § 3.6.2.2; *see id.* §§ 13.2.3, 13.5.4. The record does not demonstrate that Procenta is the standard of care for treatment of the beneficiary's condition, that it meets but does not exceed the beneficiary's medical need, and that it is at least as beneficial as existing and available medically appropriate alternatives. *See id.* Consequently, the record does not demonstrate that Procenta was generally accepted by the medical community as "appropriate" for the beneficiary.

Based on the foregoing, in accordance with the standards set forth in the MPIM, the appellant has not demonstrated that Procenta was medically reasonable and necessary. *See* 42 C.F.R. § 424.5(a)(6). Therefore, Medicare Part B does not cover the units of Procenta furnished to the beneficiary on the date of service at issue. Additionally, because CPT 15271 was billed in conjunction with the administration of Procenta, the Council finds that CPT 15271 is not covered under Medicare Part B in this case.

Turning to liability under § 1879 of the Act, Medicare may limit the liability of a beneficiary or supplier (or both) for the non-covered costs of services where the coverage denial was based on a finding that the services were not medically reasonable and necessary pursuant to § 1862(a)(1)(A) of the Act. Section 1879 further provides that the limitation on liability applies when a beneficiary or supplier did not know, and could not reasonably have been expected to know, that the items were not covered by Medicare.

The appellant has not raised any contentions regarding the ALJ's conclusion that the beneficiary in this case is not liable for any non-covered costs. *See* Exh. MAC-1; Exh. MAC-2; Dec. at 7. Accordingly, the Council summarily adopts the ALJ's finding that the beneficiary is not liable. 42 C.F.R. § 405.1112(c).

Notably, the regulations stipulate that a supplier could have been expected to know that a service was excluded from coverage based on "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or [quality improvement organizations]" or "[i]ts knowledge of what are considered acceptable standards of practice by the local medical community." 42 C.F.R. § 411.406(e)(1), (3). CMS manuals also provide that "[w]hen an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied." Medicare Claims Processing Manual (MCPM), CMS Pub. 100-04, Ch. 30, § 30.2.3. In turn, MCPM guidance establishes that acceptable standards of practice within the local community are based upon the existence of published medical literature, a consensus of expert medical opinions, and consultation with medical staff, medical associations, including local medical societies, and other health experts. *Id.*

The appellant contends that its liability should be limited because it had neither actual nor constructive knowledge that the Procenta service at issue would not be covered by Medicare. *See* Exh. MAC-2 at 5–6. In particular, the appellant contends that it found no

publications by CMS or Contractors concerning coverage eligibility of Procenta, and that Contractors issued payments to the appellant for "similar claims" over approximately 12 months, including in claims where the appellant submitted clinical records to the Contractor in response to prepayment Additional Documentation Review requests. *Id.* Further, the appellant contends that none of the circumstances enumerated under 42 C.F.R. § 411.406[4] that establish when a supplier knew or should have known that services would not be covered applies here. *See id.*

First, to the extent that Medicare has previously covered Procenta for the appellant or other suppliers, prior coverage is not determinative. Instead, each claim is considered individually, based on the record developed for that specific claim, and ALJs and the Council review the issues before them *de novo*. 82 Fed. Reg. 4974, 4979 (Jan. 17, 2017); 42 C.F.R. §§ 405.1100, 405.1108. We emphasize that prior contractor decisions are not precedential, and contractors also have authority to reopen previously paid claims and assess overpayments. *See* 42 C.F.R. § 405.980. Moreover, the Medicare program does not apply principles of equity or estoppel to coverage determinations and, thus, we find that prior coverage was not a reasonable basis for the appellant to believe that the services would be covered by Medicare.

We acknowledge the appellant's assertions that it based its assumptions on representations by the distributor and finding no transmittals or guidance by Medicare or CMS specifically concerning the coverage eligibility of Procenta. *See* Exh. MAC-2 at 5. We also recognize that the record contains an email from the Contractor regarding HCPCS Q4244. File 1 at 8. That communication clearly acknowledges that services may be denied, and that documentation would be required to support reasonable and necessary criteria. *Id.* Importantly, the appellant bears the burden of providing sufficient information to establish that the service at issue is covered and the amount of payment due. Act § 1833(e); 42 C.F.R. § 424.5(a)(6). Considering that burden, as well as the fact that Medicare is a defined benefits program, a supplier's liability is not limited simply because there is no explicit provision stating the specific service in question was not covered.

Relevant here, there are MPIM provisions that dictate the criteria for assessing coverage when there is no other guidance specifically concerning a service, and the appellant should have known that those criteria were not satisfied. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2 (explaining that such determinations are made by assessing whether the item or service is safe and effective, not experimental or investigational, and appropriate).

---

[4] The appellant cited 42 C.F.R. § 411.404 instead of § 411.406. *See* Exh. MAC-2 at 5. Section 411.404 addresses beneficiary liability, while § 411.406 sets forth criteria for determining when a provider knew services were non-covered. The record reflects that the appellant argues only it cannot be held liable under § 1879 of the Act. *See id.* at 5–6. As noted, lower levels of review found the beneficiary not liable, and the appellant does not dispute that finding. We therefore treat the citation to § 411.404 as a clerical error and assess the appellant's liability under § 411.406 and other relevant authorities.

Therefore, we find the appellant could have been reasonably expected to know that Procenta was not medically reasonable and necessary considering its participation in the Medicare program and access to coverage guidelines explaining the coverage requirements. *See* 42 C.F.R. § 411.406; *see also* CMS (formerly Health Care Financing Administration) Ruling 95-1 (Dec. 22, 1995); MCPM, Ch. 30, §§ 30.2.1–30.2.3.

As discussed above, the medical literature provided by the appellant indicates that this is an emerging field of medical science in which additional research is required. *See* File 11 at 25–54, 56–78, 81–170. The appellant has not provided medical literature, statements by professional societies, or other evidence that establishes that Procenta is safe and effective, not experimental or investigational, and appropriate for the treatment of the beneficiary's condition. *See generally* Record; *see also* MPIM, Ch. 3, § 3.6.2.2. Therefore, the appellant could reasonably have been expected to know that Medicare would not cover Procenta such that its liability is not limited under § 1879 of the Act. Accordingly, we find that the appellant is liable for the non-covered charges.

DECISION

The Council modifies the ALJ's decision, consistent with the analysis above. Medicare does not cover Procenta (HCPCS Q4244) or the services billed under CPT 15271 furnished to the beneficiary on November 14, 2022. The appellant remains liable for the non-covered charges.

**MEDICARE APPEALS COUNCIL**

Kevin L. Flynn
Administrative Appeals Judge

Judith Pichler
Administrative Appeals Judge

Date: November 14, 2025