**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| | | | |
|---|---|---|---|
| Appeal of: | Family Foot and Leg Center | OMHA Appeal No.: | 3-12532508877 |
| Beneficiary: | G. M[redacted] | Medicare Part: | B |
| Medicare No.: | [redacted] | Before: | Lewis T. Booker, Jr.<br>U.S. Administrative Law Judge |

## DECISION

The Appellant seeks Supplementary Medical Insurance (Medicare Part B) coverage for a substance with the trade name "Procenta," CPT Q4244 (2 units), and physician services, CPT 15271, furnished on November 3, 2022. I have considered the administrative record and the applicable law and policy. I enter an **UNFAVORABLE** decision in the matter of the Appellant, Family Foot and Leg Center, PA.

## PROCEDURAL HISTORY

The Appellant furnished the services and items and sought Medicare reimbursement. The Medicare Administrative Contractor denied coverage, holding that "the application of Procenta did not meet the requirements for billing an application of a skin substitute graft" and focusing on the material's status as an investigational product. File 4, p. 80. The Appellant requested reconsideration, File 3. The Qualified Independent Contractor File ruled unfavorably, also finding that the Procenta had not been approved for application as a skin substitute. The QIC also ruled, as had the MAC, that the CPT 15271 was not a service supported by the medical records. File 2.

The Appellant requested a hearing and requested resolution on the basis of the written record only. File 1. The Appellant's Request for Hearing actually related to 4 separate Beneficiaries and 4 distinct dates of service (for a total of 4 discrete cases), but not every case was assigned contemporaneously with its filing in June 2023. The case before me is one of the "later discovered" cases that was not assigned until February 2024.

With its Request for Hearing, the Appellant submitted additional materials: correspondence from a MAC employee to an employee of "Extremity Care," File 1, p. 7; a study by an organization known as the "ECRI Institute," File 1, pp. 8-182; and a U.S. "Patent Application Publication" regarding "acellular regenerative products and preservation media," File 1, pp. 183-206. I exclude those materials because they were available to the Appellant before the Appellant filed the requests for redetermination and reconsideration, and I note in this regard that the MAC had observed the absence of any submission of peer-reviewed literature on the use of amniotic membranes. *See* 42 C.F.R. §§ 405.1018(a) and (c), 405.1028(a)(2).

The image quality of the practice note for the date of service (November 3, 2022) in File 3 is superior to that in File 4; however, all references are to File 4 because that File contains an additional medical note that gives context. File 4 additionally contains scholarly articles that also appear in File 3, but File 3 contains additional articles and therefore citations will be to that file. Consistent with the Appellant's request, I decide this case on the basis of the written record. All files except those excluded were considered.

## ISSUES

The issue is whether Medicare coverage and payment are available for the items and services furnished on the date of service. If coverage and payment are not available, there is a further issue whether the Appellant's liability may be limited.

## LAW AND POLICY

Part B of Title XVIII of the Social Security Act governs the Supplementary Medical Insurance Program and provides coverage for a variety of medical services and supplies furnished by physicians, or by others in connection with physician's services and other specific health related items and services. Individuals participate voluntarily in the Medicare Part B program and pay a monthly premium. The provider, supplier, or Beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due, and the amount of payment. 42 U.S.C. § 1395*l*(e); 42 C.F.R. § 424.5(a)(6). The services or supplies must, however, be medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). If services are not medically reasonable and necessary, and therefore not covered by Medicare, the Beneficiary or provider may still be entitled to payment if the Beneficiary or provider did not know, or could not reasonably be expected to have known, that the care was not covered. 42 U.S.C. § 1395pp(a).

Medicare generally covers medical and other health services that are needed to diagnose or treat medical conditions and that meet accepted standards of medical practice. "Medical and other health services" is a term that includes physician services and services and supplies (including drugs and biologicals which are not usually self-administered by the patient) furnished as an incident to a physician's professional service, of kinds which are commonly furnished in physicians' offices, and are commonly either rendered without charge or included in the physicians' bills. 42 U.S.C. § 1395x(s).

The terms "drugs" and "biologicals" include only such drugs (including contrast agents) and biologicals, respectively, as are included (or approved for inclusion) in the United States Pharmacopoeia, the National Formulary, or the United States Homeopathic Pharmacopoeia, or in New Drugs or Accepted Dental Remedies (except for any drugs and biologicals unfavorably evaluated therein), or as are approved by the pharmacy and drug therapeutics committee (or equivalent committee) of the medical staff of the hospital furnishing such drugs and biologicals for use in such hospital. 42 U.S.C. § 1395x(t)(1).

No payment may be made for expenses incurred for items or services which "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

Under the authority of section 361 of the Public Health Service Act, 42 U.S.C. § 264, the U.S. Food and Drug Administration has issued regulations regarding products that pose a risk of communicating diseases. The regulations pertinent to this case are found at Subpart A of Part 1271 of title 21, Code of Federal Regulations.

Statutes, regulations, and CMS Rulings on point are binding. 42 C.F.R. § 405.1063. Local Coverage Determinations and similar documents issued by CMS contractors, and other CMS program guidance such as program memoranda and manual instructions, are afforded substantial deference if they are applicable to a given case. 42 C.F.R. § 405.1062(a).

## FACTS AND ANALYSIS

*Facts*

On September 16, 2022, the Beneficiary saw Isin Mustafa, DPM, while she was a hospital inpatient. The "Chief Complaint" was "Hospital Initial Consult." File 4, p. 11. The Beneficiary had pain in her right foot, hammer toe on her right foot, a fractured right foot phalanx, and an ulcer of the lower extremity. She additionally had cellulitis of a lower limb and ulcer (non-pressure, chronic) of the right toe. Dr. Mustafa had seen her earlier in the day in clinic and he sent her to the emergency department with osteomyelitis and infection in the right great toe. File 4, p. 12. The wound was described in a "bottom view (L)" image of the foot as "full-thickness ulceration with purulent drainage, odor, edema and erythema present." File 4, p. 14. Dr. Mustafa placed wound care orders with a nurse; the orders included mupirocin, 4x4s, kerlix, and secure with tape, changing daily. File 4, p. 15.

Dr. Mustafa saw the Beneficiary again on November 3, 2022. This time the "Chief Complaint" was "wound care follow-up, Procenta placement follow-up." File 4, p. 5. The Beneficiary was "offloading in surgical shoe with walker assistance." File 4, p. 7. The Beneficiary had "full thickness ulceration plantar hallux right foot with significant edema, pus, odor and erythema." The wound measured 0.2cm x 0.2cm x 0.1cm. Drainage was moderate and the wound was assessed as Grade III. Dr. Mustafa debrided the site of all non-viable tissue and "then the amniotic membrane was applied via the usual steps and protocols." File 4, p. 8.

At earlier levels of review, the Appellant submitted articles that discuss wound care, and as noted above the copies of those articles in the Request for Hearing are much more legible. The articles are: Schmiedova et al., "Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds," File 3, pp. 32-45; Dirlam, "Use of Novel Placental-derived, Comformable Allograft in the Treatment of Non-Healing Chronic Wounds", found at File 3, pp. 53-55; Wang et al., "Wound Healing," File 3, pp. 56-63; Lindley et al., "Biology and Biomarkers for Wound Healing," File 3, pp. 64-82; Hodde et al., "The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling," File 3, pp. 84-98; and Olczyk et al., "The Role of the Extracellular Matrix Components in Cutaneous Wound Healing," File 3, pp. 99-106. The Appellant also submitted a redacted opinion letter from the Tissue Reference Group of the U.S. Food and Drug Administration. File 3, pp. 50-51. With its various requests, the Appellant has also included partial copies of favorable decisions by Medicare contractors.

*Analysis*

Medicare allows coverage for drugs, biologicals, and supplies incident to a physician's service. 42 U.S.C. § 1395k(a)(1); 42 U.S.C. § 1395x(s)(2). Procenta is neither a "drug" nor a "biological" as those terms are defined in statute. *Compare* 21 U.S.C. § 321(g) *with* 42 U.S.C. § 262(i). When a "supply" is employed incident to a physician's service, the supply must be medically reasonable and necessary. See 42 U.S.C. § 1395y(a)(1)(A).

In the absence of a National Coverage Determination, which is binding, 42 C.F.R. § 405.1060, or a Local Coverage Determination, which is entitled to substantial deference, 42 C.F.R. § 405.1062, it is appropriate to look to provisions of the *Medicare Program Integrity Manual, Internet-only Pub. 100-08*, which is also entitled to substantial deference. That Manual provides that, in the absence of an NCD or an LCD, the contractors should consider the following criteria (based on statute, 42 U.S.C. § 1395y[a][1][A]) regarding the reasonableness and necessity of items or services: It is safe and effective; it is not experimental or investigational; it is appropriate, including the duration and frequency in terms of whether the service or item is (a) furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member; (b) furnished in a setting appropriate to the beneficiary's medical needs and condition; (c) ordered and furnished by qualified medical personnel; and (d) one that meets, but does not exceed, the beneficiary's medical need. *MPIM*, ch. 3, § 3.6.2.2.

The Appellant has submitted a redacted copy of a letter from the FDA Tissue Reference Group dated August 19, 2020, that addresses the application of Section 361 of the Public Health Service Act (42 U.S.C. § 264) and implementing regulations (21 C.F.R. Part 1271), in support of its claim for coverage. In that letter, the FDA noted certain limitations on the opinion issued, limitations which were redacted in the version of the letter submitted and which might apply to the circumstances of the matter now before me. One limitation that was not redacted, and pertinent here, is that Procenta could not be regulated as a human cell or tissue product for homologous use (the authorities cited above) if it were employed for "treatment of chronic wounds." While regulation as an HCT/P might have opened some avenues for employing Procenta as a supply incident to a physician's service, such regulation never guaranteed that the product would be considered medically reasonable or necessary in any given setting.

The Appellant has also submitted copies of contractor decisions allowing coverage for Procenta in certain post-surgical settings. The contractor decisions are not binding upon me in any fashion. I further note that the specific decisions involved use in patients who had undergone excision of squamous cell carcinoma (a type of skin cancer). This sort of application appears to be one contemplated in the TRG letter, namely, as a barrier or to cover a wound bed. An excisional wound is not, as I interpret the plain language, a "chronic wound," so the relevance of the contractor letters is minimal at best.

The Schmiedova article appears to be a meta-analysis of existing studies, and accordingly it does little to advance the inquiry whether Procenta is safe and effective under any particular set of circumstances. The article does cite numerous examples where a chronic wound benefited from the application of amniotic membrane; the article cautions as well that the membrane is "a biologically derived material, and there are the same problems as with other applications of biological material" such as transmission of disease. If Procenta is indeed regulated as an HCT/P, then perhaps some of the Schmiedova concerns are lessened. The "clinical applications" do not involve use for chronic wound healing; instead, they include skin burns and avoidance of tissue adhesion in certain types of surgeries.

The Appellant submitted a case study by Ronald Dirlam, DPM, in which the physician treated a diabetic ulcer. That case study does demonstrate that Procenta was effective as a treatment, but a single case study cannot be considered the "medically accepted standard" in cases of chronic wounds. The case study also makes no mention of the "safety" aspect (e.g., adverse skin reaction to the treatment). The Wang article on Wound Healing was published in 2017; TRG approval to market Procenta was not granted until 2020. The Wang article discusses amniotic membrane only briefly, and characterizes it as "efficacious in experimental and human disease." The brief summary also discusses the substance in a "non-homologous" sense, in that it is dependent on the activity of living cells for its primary function. *See* 21 C.F.R. § 1271.10(a)(4). The Lindley article is useful in discussing what biomarkers or other signs might reveal whether healing is occurring, but it does not otherwise contribute to an understanding of how Procenta works on any given Beneficiary. The Hodde and Olczyk articles both discuss extracellular matrix. Extracellular matrix is not a "covering," which is the application that Procenta is being put toward in this case; extracellular matrix can best be understood as a grid that supports new structures as might be found in granulation of a wound bed.

As demonstrated by the very brief discussion of the articles set out above, the use of Procenta as a "skin substitute graft," as happened in this case, is not well supported by medical literature. It is, in other words, not "furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition." *MPIM*, ch. 3, § 3.2.2.6. It is, to the contrary, an investigational use (one that essentially is done without a good idea whether the use is either safe or effective; *cf.* 42 U.S.C. § 355[b][setting out requirements for a new drug application, including requirements to test for safety and effectiveness]) of Procenta as a skin substitute, because sufficient clinical study of such use does not exist.

The practice note from the hospital encounter has few details about wound care. The note does mention an ulceration somewhere on the right leg, and it mentions as well what is described as a chronic, non-healing ulcer on the right large toe. The note mentions pain in the right foot, perhaps not surprising due to the chief hospital complaint of a fracture in the foot. No measurements are given for the wound

that was dressed (other than the reference to "4x4s"). It may be a stretch to characterize the wound on the date of service as "chronic, non-healing."

More to the point, however, on the date of service (November 3, about 6 weeks after the hospital encounter) the Appellant employed Procenta in a manner that does not appear to be in accordance with generally accepted standards of medical practice. The use of the Procenta and the service to apply it fail to meet the criteria of the *MPIM*. The physician service of applying a skin substitute graft (CPT 15271) is not supported as no "skin substitute graft" was actually applied.

*Liability*

Section 1879 of the Social Security Act, 42 U.S.C. § 1395pp, applies when a Beneficiary or provider did not know, and could not reasonably have been expected to know, that Medicare would not cover services not found to be medically reasonable and necessary; *see* 42 U.S.C. § 1395y(a)(1)(A). A provider of services is deemed to have actual or constructive knowledge of non-coverage based upon its receipt of CMS notices (e.g., manuals or written guides produced by the Government, or directives issued by Medicare contractors), or its knowledge of what are considered acceptable standards of practice by the local medical community. CMS Ruling 95-1; *see also* 42 C.F.R. § 411.406. In determining the Beneficiary's knowledge of non-coverage, the regulations presume that the Beneficiary lacks the requisite knowledge unless a written notice of non-coverage has been provided to the Beneficiary. 42 C.F.R. § 411.404.

There is no written notice to the Beneficiary in the file; accordingly, the statutory provision limits the Beneficiary's liability. 42 U.S.C. § 1395pp. The provider, however, is liable for the non-covered services, as established at the Administrative Contractor level. It is presumed to have actual or at the very least constructive knowledge because of its receipt of CMS notices, or its knowledge of what are considered acceptable standards of practice by the local medical community. CMS Ruling 95-1 at 19-20; 42 C.F.R. § 411.406(e). Consequently, the Appellant is not entitled to a limitation on liability under section 1879 of the Act.

## CONCLUSIONS OF LAW

The 2 units of Procenta applied on the date of service and the physician services necessary to apply it were not medically reasonable and necessary, and Medicare coverage is thus not available. The Appellant has not carried its burden. 42 U.S.C. § 1395*l*(e). The Appellant is liable for the non-covered items and its liability is not limited by law.

## ORDER

I direct the Medicare contractor to process the claim in accordance with this decision.

**SO ORDERED**

Lewis T. Booker, Jr.
U.S. Administrative Law Judge
14 March 2024