# EXHIBIT A-4

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Numbers: M-24-343 & M-24-476
OMHA Appeal Numbers: 3-12682582007 & 3-12797782057

Family Foot and Leg Center
730 Goodlette Road
Ste. 102
Naples, FL 34102

NOTICE OF CONSOLIDATED DECISION OF MEDICARE APPEALS COUNCIL

Notice to Beneficiaries

You are one of the beneficiaries whose Medicare claim is included in this order. To preserve your privacy, only the appellant will receive a list of all beneficiaries. Each beneficiary will receive a redacted beneficiary list.

What This Notice Means

Enclosed is a copy of the decision of the Medicare Appeals Council. If you have any questions, you may contact the Centers for Medicare & Medicaid Services regional office or the local Medicare contractor.

Your Right to Court Review

If you desire court review of the Council's decision and the amount in controversy is $1,960 or more, you may commence a civil action by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business. *See* § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The complaint must be filed within sixty days after the date this letter is received. 42 C.F.R. § 405.1130. It will be presumed that this letter is received within five days after the date shown above unless a reasonable showing to the contrary is made. 42 C.F.R. § 405.1136(c)(2).

If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

This notice and enclosed order were mailed on February 2, 2026.

Enclosure

cc: Beneficiaries
Rivas Goldstein, LLP
Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket Nos. M-24-343 & M-24-476**

Family Foot and Leg Center, Appellant
OMHA Appeal Nos. 3-12682582007 & 3-12797782057

## CONSOLIDATED DECISION

The Administrative Law Judges (ALJs) issued two decisions dated September 6, 2023, and November 7, 2023, concerning Medicare Part B coverage of Procenta, a placental-derived allograft (Healthcare Common Procedure Coding System (HCPCS) code Q4244), and a skin substitute graft (Current Procedural Terminology (CPT) code 15271), furnished by the appellant-supplier (supplier) to the beneficiaries J.D. and M.Y. on separate dates of service.[1] The ALJs concluded that Medicare did not cover Procenta or the procedure because they were not medically reasonable and necessary. The ALJs further held the supplier liable for the non-covered costs under § 1879 of the Social Security Act (Act).

The supplier, through an appointed representative, has filed a request for review, seeking Medicare Appeals Council (Council) review of the ALJ's decision regarding beneficiary J.D. (Office of Medicare Hearings and Appeals (OMHA) Appeal Number 3-12682582007). We docketed this request under docket number M-24-343. The Council enters into the record the representative's DAB-101 form as Exhibit (Exh.) MAC-1, and the supporting brief as Exh. MAC-2. Further, we enter the Council's letter to the supplier dated January 8, 2025, as Exh. MAC-3, and the supplier's response as Exh. MAC-4.

Additionally, the supplier, on their own behalf, filed a request for review seeking Council review of the ALJs' decisions regarding beneficiary J.D. (OMHA #3-12682582007) and beneficiary M.Y. (OMHA #3-12797782057). We docketed this request under docket number M-24-476. The Council enters into the record the supplier's DAB-101 form as Exh. MAC-5 and the supporting brief as Exh. MAC-6. Further, we enter the Council's correspondence dated February 4, 2025, and the supplier's response, as Exh. MAC-7 and Exh. MAC-8, respectively.

---

[1] The complete list of beneficiaries and dates of service is in Attachment A to this decision. For privacy purposes, each beneficiary will receive a redacted version of Attachment A that contains only the information that corresponds to that beneficiary.

With the requests for review, the supplier and representative have submitted additional documents. To the extent that these documents are new evidence, the supplier and representative provide no showing of good cause to admit them for the first time at the Council level; to the extent that these documents are duplicative, there is no need to admit these additional copies into the record. *See* 42 C.F.R. § 405.1122(c). Thus, we exclude these documents from evidence but retain them in the record. We enter the documents submitted in M-24-343 into the record as Exh. MAC-9 (excluded),[2] and the documents submitted in M-24-476 into the record as Exh. MAC-10 (excluded) for identification purposes only.

The Council issues a consolidated decision. We review the ALJs' decisions *de novo* but limit our review to the exceptions the supplier and representative raised in the requests for review. 42 C.F.R. §§ 405.1100, 405.1108, 405.1112(c).

We modify the ALJs' decisions to clarify the basis for denial, as set forth in our analysis below. We find that Medicare does not cover the services at issue because the record does not support that they were medically reasonable and necessary in accordance with applicable Medicare authorities. The appellant is liable for the non-covered costs.

## DISCUSSION

At issue in this case is Medicare Part B coverage of Procenta injections furnished to the beneficiaries on various dates of service, for treatment of an ulcer of the left lower extremity (beneficiary J.D.) and a right leg ulcer (beneficiary M.Y.). *See* Exh. MAC-2; Exh. MAC-6; Decisions (Decs.); J.D. File 7[3] at 54; M.Y. File 7 at 10. With respect to both cases, the Medicare Administrative Contractor (MAC) denied the claim for Procenta and the related injection initially and on redetermination. J.D. File 7 at 282-83; M.Y. File 6 at 3-4. The MAC noted that the records did not support that Procenta was safe and effective and not experimental or investigational, and lacked peer reviewed literature supporting the use of the product at issue. J.D. File 7 at 283; M.Y. File 6 at 4.

On reconsideration, the Qualified Independent Contractor (QIC) found that the U.S. Food and Drug Administration (FDA) had yet to determine whether Procenta was safe and effective in these circumstances, and therefore, is considered investigational and

---

[2] The supplier argues that the "recent article citing randomized controlled studies" was not available during the ALJ appeals. Exh. MAC-6. We find that the supplier is referring to the "DF Blog," which has a publication date of October 2, 2022. *See* Exh. MAC-9. The Requests for Hearing in these cases were filed on June 29, 2023, and August 24, 2023, after the publication of the blog. *Compare* Exh MAC-9, *with* J.D. File 1 at 1, *and* M.Y. File 4 at 1. Because the supplier has not provided good cause for why this document has been submitted for the first time before the Council, we decline to admit it as evidence. *See* 42 C.F.R. § 405.1122(c).

[3] Unless otherwise noted, all references to beneficiary's J.D. case file are in reference to docket number M-24-476. We have reviewed both case files thoroughly and find the case files for beneficiary J.D. in both M-24-476 and M-24-343 to be identical. *See* Record M-24-476; *see also* Record M-24-343.

experimental. J.D. File 2 at 5; M.Y. File 3 at 5. Additionally, the QIC denied coverage of the related claims for the injections. J.D. File 2 at 5; M.Y. File 3 at 5.

In both cases, the ALJs issued an on-the-record decision and determined that Medicare Part B did not cover Procenta in these cases. Regarding beneficiary J.D., the ALJ found that there is insufficient documentation to support medical necessity or general acceptance in the medical community for the reported procedure. J.D. Dec. at 6. Specifically, the ALJ found that application of Procenta for the specified use does not meet the definition of homologous use in accordance with 21 C.F.R. § 1271.3(c), and that the criteria of 21 C.F.R. § 1271.10(a) are not met. *Id.* Further, the ALJ found that documentation failed to show that the FDA approved Procenta as safe and effective for the treatment at issue and, therefore, the use of Procenta does not meet Medicare medical necessity requirements. *Id.* Regarding beneficiary M.Y., the ALJ specifically found that Procenta was used for a non-homologous use not covered under Medicare Part B. M.Y. Dec. at 3.

Before the Council, the supplier raises several contentions. As to both beneficiaries, the supplier argues that the use of Procenta is "safe, effective and not experimental with numerous peer studies and [M]edicare's approval of usage of birth tissue products as skin substitutes." Exh. MAC-6. Further, the supplier argues that the FDA Tissue Reference Group (TRG) issued a letter that "validates the use of such for homologous use as would covering to retain moisture." *Id.* Finally, the supplier points to a medical Technical Brief Project, an email from Medicare stating, "error in [M]edicare's computer in regards to 1572 x type of codes [with] Q4244" and previous favorable coverage determinations as evidence that Procenta complies with Medicare policies. *Id.*

Additionally, specifically regarding beneficiary J.D., the supplier argues that the FDA promulgated the requirements for manufacturing a biological product that is considered an human cells, tissues, and cellular or tissue based products (HCT/P) under the authority of the Public Health Service Act (PHSA) that the ALJ "flippantly rejected the FDA's determination on whether Procenta, when used as a wound covering, constitutes an HCT/P under Section 361 of the [PHSA]." Exh. MAC-2 at 3. Further, the supplier asserts that the ALJ clearly erred to conclude that Procenta is not safe and effective or is experimental or investigational solely based on whether Procenta complies with § 351. *Id.* The supplier argues that the FDA's TRG's opinion affirms the safety and efficacy of the product. *Id.* Finally, the supplier contends that it should not be held liable under § 1879 of the Act because it did not have actual or constructive knowledge that the Procenta injection would not be covered by Medicare.[4] *See id.* at 3-4.

---

[4] The supplier states that this "appeal concerns an alleged overpayment" and argues that it "cannot be found liable for the alleged overpayment." Exh. MAC-2 at 1, 4. Upon review of the record, we find that the claim was initially denied by the MAC and an overpayment was not assessed against the supplier. *See* J.D. File 7 at 282, 284.

As a preliminary matter, we address the supplier's contentions that prior favorable decisions in similar cases preclude a denial of coverage in these cases. Exh. MAC-6; Exh. MAC-2 at 4. However, the fact that lower levels of appeal may have previously decided in the supplier's favor on any basis is irrelevant in this case because, as a district court has explained, the "Medicare regulations reveal an administrative review structure incompatible with applying collateral estoppel at the agency level." *Christenson v. Azar*, No. 20-C-194, 2020 WL 3642315 at *5 (E.D. Wis. July 6, 2020); *see also Almy v. Sebelius*, 679 F.3d 297, 310 (4th Cir. 2012) ("[I]t is undisputed that these lower-level decisions are not precedential and not binding on the [Council]. . . . There is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level."); 42 C.F.R. §§ 405.1000(d), 405.1100(c) (noting that ALJs and the Council conduct a *de novo* review of the facts and laws based on the record developed for the claim at issue). Therefore, the Council will proceed with a review of the claims, based on the administrative records before us.

Pursuant to § 1862(a)(1)(A) of the Act, Medicare covers only items and services that are medically reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the function of a malformed body member. As the party seeking payment, the appellant has the burden to demonstrate that the services for which it seeks coverage are reasonable and necessary for the purposes provided. 42 C.F.R. § 424.5(a)(6).

Absent an applicable National Coverage Determination (NCD) or Local Coverage Determination (LCD), as is the case here, contractors and adjudicators must make individual reasonable and necessary determinations by assessing whether the service is safe and effective, not experimental or investigational, and appropriate. Medicare Program Integrity Manual (MPIM), Centers for Medicare and Medicaid Services (CMS) Pub. 100-08, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2. Medicare defines "appropriate" to require, among other things, that the service must be furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member; that it is a service that meets, but does not exceed, the beneficiary's medical need; and that it is furnished in a setting appropriate to the beneficiary's medical needs and condition. *See id.* § 3.6.2.2.

The MPIM further states that, when developing an LCD, a MAC shall use evidence of "general acceptance by the medical community" including "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." MPIM, Ch. 13, § 13.5.3; *see also id.* § 13.2.3 (stating "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community"). While these MPIM provisions constitute guidance for contractors assessing medical reasonableness and necessity and in conducting an evidentiary review during an LCD's development, they necessarily apply to adjudicators, including ALJs and the Council, reviewing the contractor's medical reasonableness and

necessity determination in the absence of an applicable NCD or LCD. The manual provisions thus treat the underlying peer-reviewed medical literature as an inherent part of evaluating whether an item or service is reasonable and necessary, including whether it is safe, effective, appropriate, and not experimental or investigational. *See* MPIM, Ch. 3, § 3.6.2.2; 42 C.F.R. § 405.1046(a) (noting that the ALJ's decision should include "a summary of any clinical or scientific evidence used in making the determination"); *see also* MPIM, Ch. 13, §§ 13.2.3, 13.5.3, 13.5.4; Medicare Claims Processing Manual (MCPM), CMS Pub. 100-04, Ch. 30, § 30.2.3 (providing that contractors will consider peer-reviewed medical literature in determining what "accepted standards of practice" exist in the medical community).

All statutes and regulations pertaining to the Medicare program are binding on ALJs and the Council. 42 C.F.R. § 405.1063(a). While not bound by the MPIM guidance, ALJs and the Council must give the MPIM substantial deference if it is applicable to a particular case. *Id.* § 405.1062(a). If an ALJ or the Council declines to follow MPIM guidance, the decision must explain the reasons why the ALJ or the Council departed from the MPIM, and it does not have precedential effect. *Id.* § 405.1062(b).

After careful review, the Council concludes that the evidence in the record does not support that the use of Procenta in these cases was medically reasonable and necessary pursuant to the standards in the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2. We modify the ALJs' decisions to clarify that the denials are based on an analysis of the MPIM factors in the guidance described above.

As an initial matter, we address the ALJs' findings regarding "homologous use" and § 351 of the PHSA. J.D. Dec. at 6; M.Y. Dec. at 3. We find no authority to adjudicate the issue of whether Procenta is properly regulated under § 351 or exempt under § 361 of the PHSA, including whether the homologous use requirement under 21 C.F.R. § 1271.10(a)(2) was met. Medicare appeals regulations set forth our jurisdiction, and we do not interpret them as giving us the authority to make determinations with regard to the appropriate categorization of Procenta for purposes of FDA regulation. *See* 42 C.F.R. § 405.924. In the absence of any identified authority to make such a determination, we decline to do so.

Further, as it relates to our review under the applicable MPIM guidance, Medicare regulations state that FDA categorization is only "*a factor* in making Medicare coverage decisions." *See* 42 C.F.R. § 405.201(a)(1) (emphasis added); 78 Fed. Reg. 48164, 48165 (Aug. 7, 2013). Thus, we do not find that FDA categorization alone determines Medicare coverage. We highlight that Medicare is administered by CMS, not by the FDA. *See* 42 U.S.C. §§ 1395-1395lll. The evidence that is required to support a product's ability to be used and marketed is a separate question from whether it is safe and effective, not experimental or investigational, and appropriate for purposes of Medicare coverage. *See* 78 Fed. Reg. at 48165. As a result, any contentions (or determinations otherwise) that

Procenta does or does not meet the criteria for regulation under 21 C.F.R. § 1271.10(a) and § 351 or § 361 of the PHSA are not determinative of Medicare coverage. Accordingly, the ALJ did not employ the proper analysis, and we modify the decisions to apply the MPIM factors instead.

We are not persuaded that coverage is appropriate based on the supplier's contentions that Procenta is safe and effective because its use is consistent with the TRG's interpretation of § 361 of the PHSA and 21 C.F.R. § 1271.10(a). Exh. MAC-2 at 3; Exh. MAC-6. In support, the supplier has provided a letter from the FDA TRG, which was sent to the supplier in response to a request for a recommendation for Procenta. J.D. File 7 at 158-60; M.Y. File 6 at 49-50. This letter discusses different applications of Procenta, and whether those applications would qualify for regulation under § 361. *See e.g.* J.D. File 7 at 158-60. However, we reiterate that even if Procenta satisfies § 361 requirements of the PHS Act, ALJs and the Council must still apply the medical reasonableness and necessity criteria outlined in the MPIM to the individual facts of these claims, as detailed below. *See* 42 C.F.R. § 405.201(a)(1); *see also id.* § 405.201(a)(2) ("CMS *may* consider for Medicare coverage [FDA approved devices] that have been categorized as . . . Nonexperimental/investigational.") (emphasis added); *id.* § 405.1062(a)(2) (requiring ALJs and the Council to provide an explanation if they decline to follow a coverage manual in a particular case). Accordingly, any contentions or determination that Procenta met the criteria for regulation under 21 C.F.R. Part 1271 and § 361 of the PHS Act are unpersuasive, as this is not determinative of Medicare coverage.

Turning to the MPIM analysis, at the lower levels of review, the supplier submitted the beneficiaries' medical records; manufacturer-generated information regarding Procenta; examples of QIC reconsideration decisions in other cases; a letter from the FDA TRG, dated August 19, 2020; a technical brief from the Agency for Healthcare Research and Quality (AHRQ); an email from a MAC regarding HCPCS code Q4244; a patent application publication; a HCPCS Code Application Summary and CMS Decision for Procenta; and medical literature. J.D. File 1 at 7-206; J.D. File 5 at 3-118; J.D. File 7 16-276; M.Y. File 4 at 7-217; M.Y. File 6 at 31-135; M.Y. File 7 at 6-13. The medical literature provided consisted of the following:

- Ronald L. Dirlam, DPM, *Use of Novel Placental-derived, Conformable Allograft in the Treatment of Non-Healing Chronic Wounds*;
- A chapter from an unknown volume by Jason P. Hodde and Michael C. Hiles entitled *The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling*;
- Linsey E. Lindley, PhD, et al., *Biology and Biomarkers for Wound Healing*, 138(3) Plastic Reconstruction Surgery 18S-28S (Sept. 2016);
- Pawel Olczyk, et al., *The Role of the Extracellular Matrix Components in Cutaneous Wound Healing*, Biomed Research International (2014);

- Iveta Schmiedova, et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, Membranes (2021);
- Thomas E. Serena, M.D., et al., *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Huma Amniotic Membrane in the Treatment of Venous Leg Ulcers*; PRS Journal;
- William Tettelbach, *The influence of adequate debridement and placental-derived allografts on diabetic foot ulcers*, 31 Journal of Wound Care 9 (September 2022).
- Peng-Hui Wang, et al., *Wound Healing*, 81 J. of the Chinese Medical Association 94 (2018);

J.D. File 5 at 15-28, 36-65, 67-89; M.Y. File 4 at 205-215; M.Y. File 6 at 31-44, 52-81, 83-105; M.Y. File 7 at 14-22.[5]

Based on our review of the record, we find that the provided evidence does not demonstrate that Procenta was medically reasonable and necessary. Act § 1862(a)(1)(A). Without an applicable NCD or LCD, the MPIM clarifies that reasonableness, and necessity depends on whether the treatment is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, § 3.6.2.2.

We have considered the evidence provided, including the medical literature; however, we do not find sufficient support to demonstrate that Procenta is safe and effective under Medicare criteria for the treatment of the beneficiaries' conditions. Most of the research articles do not involve or discuss Procenta, nor do they evaluate the clinical use of an amniotic product for lower extremity ulcers, like the beneficiaries' conditions here. J.D. File 5 at 15-28, 36-65, 67-89; M.Y. File 4 at 205-215; M.Y. File 6 at 31-44, 52-81, 83-105; M.Y. File 7 at 14-22. We cannot assume that studies of different products support the use of Procenta.

*Use of Novel Placental-derived, Conformable Allograft in the Treatment of Non-Healing Chronic Wounds* is the only article submitted that involves patients with lower extremity ulcers and who were treated with Procenta. J.D. File 5 at 36-38; M.Y. File 6 at 52-54. However, it involves a single case study of a patient with diabetic foot ulcer that was treated with Procenta, and it is not clear whether this single case study should be extrapolated to other patients. Further, it cannot be confirmed whether this research article was published in a peer-reviewed medical journal. *See, e.g.*, J.D. File 5 at 36-38. The absence of verifiable peer-review and publication status is insufficient to meet the evidentiary standard set forth in MPIM, Ch. 3, § 3.6.2.2 and MPIM, Ch. 13, § 13.5.3 and

---

[5] The article titled *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Huma Amniotic Membrane in the Treatment of Venous Leg Ulcer* authored by Thomas E. Serena, M.D., et al., and the article titled *The influence of adequate debridement and placental-derived allografts on diabetic foot ulcers* authored by William Tettelbach, appear only in M.Y.'s case file (OMHA #3-12797782057). As a result, we address those articles only in consideration of M.Y.'s records.

is therefore insufficient to support safety and effectiveness of Procenta to treat the types of wounds at issue here. *See id.*

The *Wound Healing* review article summarizes the physiological and pathological processes of wound healing and stem cell therapy and prevention strategy for excessive wound healing. J.D. File 5 at 39-46; M.Y. File 6 at 55-62. The *Biology and Biomarkers for Wound Healing* article discusses literature identifying biomarkers associated with normal and aberrant wound healing. J.D. File 5 at 47-65; M.Y. File 6 at 63-81. *The Role of the Extracellular Matrix Components in Cutaneous Wound Healing* article provides an overview of the wound healing process, with particular focus on the role of extracellular matrix constituents. J.D. File 5 at 82-89; M.Y. File 6 at 98-105. The book chapter, *The Interplay of ECM-Based Graft Materials and Mechanisms of Tissue Remodeling*, provides an explanation of the interplay of the extracellular matrix with the bodies' cells during one phase of the wound healing process called remodeling. J.D. File 5 at 67-81; M.Y. File 6 at 83-97. The *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds* article provides only a broad summary of case studies with a general claim of efficacy in the context of historical background and rationale for use of amniotic membrane derivatives in wound healing. J.D. File 5 at 15-28; M.Y. File 6 at 31-44. The article, however, provides little detail about the circumstances of studies, particular products, methods used, comparison to accepted treatments, or safety data. *See, e.g.*, J.D. File 5 at 15-28. *The influence of adequate debridement and placental-derived allografts on diabetic foot ulcers* article examines the frequency of debridement, particularly at the intervals of seven days, as an essential component of wound care. M.Y. File 4 at 205-215. *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Huma Amniotic Membrane in the Treatment of Venous Leg Ulcers* article reports data on venous leg ulcers, however, the study's modest sample size and absence of blinding substantially weaken its evidentiary value. M.Y. File 7 at 14-22. None of these articles discuss the use of Procenta, whether for use with lower extremity ulceration, or for other symptoms or diagnoses.

The records also include a technical brief from the Agency for Healthcare Research and Quality (AHRQ) titled *Skin Substitutes for Treating Chronic Wounds*. J.D. File 1 at 8-182; M.Y. File 4 at 7-181. In the brief, AHRQ identified 76 commercially available skin substitutes, most of which are acellular dermal products derived from human placental membrane, animal tissue, or donated human dermis. *See, e.g.*, J.D. File 1 at 10. We note that Procenta was not included in this brief. *Id.* at 28-32. The brief examined studies on approximately 25 skin substitutes assessing their use in chronic wounds like diabetic foot ulcers, venous leg ulcers, and pressure ulcers. *Id.* at 10, 16. These trials mainly tracked wound closure rates but lacked data on key outcomes such as wound recurrence, pain, function, and quality of life. *Id.* Consequently, AHRQ concluded that evidence regarding skin substitutes is limited, and emphasized the need for better-designed, longer-term studies to truly assess their effectiveness. *Id.*

Further, the records do not include sufficient evidence that Procenta is not "experimental or investigational," as defined in the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2. Rather, as discussed above, of the medical literature provided, only one article involves the use of Procenta in their respective study. *See* J.D. File 5 at 36-38; M.Y. File 6 at 52-54. However, that article lacks verifiable peer-review and publication status and is therefore insufficient to meet the evidentiary standard set forth in MPIM, Ch. 3, § 3.6.2.2 and MPIM, Ch. 13, § 13.5.3. J.D. File 5 at 36-38; M.Y. File 6 at 52-54.

The remaining articles, including the technical brief, consistently reference the investigational nature of the respective studies or recommend that more research is required to draw more definitive conclusions or to extrapolate the results beyond their particular study parameters. *See, e.g.*, J.D. File 1 at 16 ("The lack of studies examining the efficacy of most skin substitute products and the need for better-designed and -reported studies providing more clinically relevant data in this field are this Technical Brief's clearest implications."); *id.* at 74-75 (concluding future studies should employ standardized methods, include at least 12 weeks of treatment with follow-up for recurrence, and importantly, ensure blinded randomized allocation and blinded assessment of wound healing to minimize bias); J.D. File 5 at 15, 21-22 (noting that amniotic membrane grafts have "potential" for chronic wound healing and that the time of treatment and number of applications depends on the individual parameters of the wound and varies in the sources); *id.* at 36-38 (lacking verifiable peer-review and publication status but concluding that Procenta was promising in a single patient); *id.* at 44 (concluding the review article "only provides a basic understanding of pathogenesis about the wound healing" and "[m]ore studies focusing on human wound healing are welcome"); *id.* at 47, 55 (concluding "[b]iomarkers may help identify and stratify subsets of non-healing patients for whom biomarker-guided approaches may aid healing" and there are "promising biomarkers utilizing different avenues of sample collection are currently in development"); *id.* at 67-81 (explaining that the processing of the product plays a major role in its effectiveness, and generally noting favorable and less favorable outcomes of studies evaluating functional tissue remodeling using extracellular matrix biomaterials); *id.* at 82-89 (discussing the role of extracellular matrix components in cutaneous wound healing but not presenting data from a patient cohort or clinical study).

In addition, we find that the records do not include evidence to support that Procenta was "appropriate" for the treatment of the beneficiaries' conditions, as defined in the MPIM. In this case, the medical records reflect that beneficiary J.D. received Procenta via "application of amniotic membrane/injection graft application" to treat an ulcer of the lower left extremity. J.D. File 7 at 52, 54. Likewise, the medical records reflect that beneficiary M.Y. received Procenta via "application of amniotic membrane/injection graft application" to treat an ulcer on the right leg. M.Y. File 7 at 9-10. As discussed above, most of the records' evidence provided does not document or recommend the use of Procenta specifically. *See* J.D. File 5 at 15-28, 36-65, 67-89; M.Y. File 4 at 205-215; M.Y. File 6 at 31-44, 52-81, 83-105; M.Y. File 7 at 14-22. We do not find evidence

potentially supporting one product's use in a particular treatment justifies appropriate use of a different product for another medical condition.

The MPIM instructs that "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." MPIM, Ch. 13, § 13.2.3. Beyond the medical literature and AHRQ brief, we find no evidence in the records that physicians in the supplier's local community are regularly utilizing products such as Procenta. *See* J.D. Record; *see also* M.Y. Record. Therefore, we find insufficient evidence that Procenta was "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition[.]" MPIM, Ch. 3, § 3.6.2.2; *see id.* §§ 13.2.3, 13.5.4. The records do not demonstrate that Procenta is the standard of care for treatment of the beneficiaries' conditions, that it meets but does not exceed the beneficiaries' medical needs, and that it is at least as beneficial as existing and available medically appropriate alternatives. *See* MPIM, Ch. 3, § 3.6.2.2; *see id.* §§ 13.2.3, 13.5.4. Consequently, the records do not demonstrate that Procenta was generally accepted by the medical community as "appropriate" for the beneficiaries.

Based on the discussion above, and in accordance with the standards set forth in the MPIM, the supplier has not demonstrated that Procenta was medically reasonable and necessary. *See* 42 C.F.R. § 424.5(a)(6). Therefore, Medicare Part B does not cover the units of Procenta furnished to the beneficiaries on the dates of service at issue. Additionally, because CPT code 15271 was billed in conjunction with the administration of Procenta, the Council finds that CPT code 15271 is not covered under Medicare Part B in these cases.

Turning to liability under § 1879 of the Act, Medicare may limit the liability of a beneficiary or supplier (or both) for the non-covered costs of services where the coverage denial was based on a finding that the services were not medically reasonable and necessary pursuant to § 1862(a)(1)(A) of the Act. Section 1879 further provides that the limitation on liability applies when a beneficiary or supplier did not know, and could not reasonably have been expected to know, that the items were not covered by Medicare.

In M-24-476, the supplier argues that its liability should be limited because it did not know that Procenta would not be covered. Exh. MAC-6. The supplier argues that it relied on the TRG Letter from the FDA that proves that Procenta complies "with the 361 designation and the use on wounds is one of the indications," that it depended on prior favorable coverage decisions, an email from the MAC stating that coverage was intended, a U.S. Patent Application with the intent of coverage, and prior favorable testimony regarding coverage from a CMS medical reviewer to determine coverage. *Id.* In M-24-343, the supplier contends that its liability should be limited because it had neither actual nor constructive knowledge that the Procenta service at issue would not be covered by Medicare. *See* Exh. MAC-2 at 3-4. In particular, the representative contends that it

found no publications by CMS or Medicare contractors concerning coverage eligibility of Procenta, and that Medicare contractors issued payments to the appellant for "similar claims" over approximately 12 months, including in claims where the appellant submitted clinical records to the contractor in response to prepayment Additional Documentation Review requests. Exh. MAC-2 at 3-4. Further, the representative contends that none of the circumstances enumerated under 42 C.F.R. § 411.406[6] that establish when a supplier knew or should have known that services would not be covered applies here. *See id.*

Notably, the regulations stipulate that a supplier could have been expected to know that a service was excluded from coverage based on "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or [quality improvement organizations]" or "[i]ts knowledge of what are considered acceptable standards of practice by the local medical community." 42 C.F.R. § 411.406(e)(1), (3). CMS manuals also provide that "[w]hen an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied." Medicare Claims Processing Manual (MCPM), CMS Pub. 100-04, Ch. 30, § 30.2.3. In turn, MCPM guidance establishes that acceptable standards of practice within the local community are based upon the existence of published medical literature, a consensus of expert medical opinions, and consultation with medical staff, medical associations, including local medical societies, and other health experts. *Id.*

First, to the extent that Medicare has previously covered Procenta for the appellant or other suppliers, or that there has been favorable testimony at prior ALJ hearings, prior coverage is not determinative. Instead, each claim is considered individually, based on the record developed for that specific claim, and ALJs and the Council review the issues before them *de novo*. 82 Fed. Reg. 4974, 4979 (Jan. 17, 2017); 42 C.F.R. §§ 405.1100, 405.1108. We emphasize that prior contractor decisions are not precedential, and contractors also have authority to reopen previously paid claims and assess overpayments. *See* 42 C.F.R. § 405.980. Moreover, the Medicare program does not apply principles of equity or estoppel to coverage determinations and, thus, we find that prior coverage was not a reasonable basis for the appellant to believe that the services would be covered by Medicare.

We recognize that the record contains an email from the contractor regarding HCPCS code Q4244. *See, e.g.*, J.D. File 1 at 7. That communication clearly acknowledges that services may be denied, and that documentation would be required to support reasonable

---

[6] The representative cited 42 C.F.R. § 411.404 instead of § 411.406. *See* Exh. MAC-2 at 4. Section 411.404 addresses beneficiary liability, while § 411.406 sets forth criteria for determining when a provider knew services were non-covered. The record reflects that the representative argues only that it cannot be held liable under § 1879 of the Act. *See id.* at 3-4. As noted, lower levels of review found the beneficiary not liable, and the representative does not dispute that finding. We therefore treat the citation to § 411.404 as a clerical error and assess the supplier's liability under § 411.406 and other relevant authorities.

and necessary criteria. *Id.* Likewise, the FDA TRG's letter discusses different applications of Procenta, and whether those applications would qualify for regulation under § 361. *See, e.g.*, J.D. File 7 at 158-60. However, as discussed above, even if Procenta satisfies § 361 requirements of the PHS Act, ALJs and the Council must still apply the medical reasonableness and necessity criteria outlined in the MPIM to the individual facts of these claims. *See* 42 C.F.R. § 405.201(a)(1); *see also id.* § 405.201(a)(2); *id.* § 405.1062(a)(2). Similarly, while the patent application contains descriptions of Procenta and its indications for use as a wound-covering, it does not demonstrate that Procenta is safe and effective under Medicare criteria for treatment of the beneficiaries' conditions. *See, e.g.*, J.D. File 1 at 197.

We also acknowledge the assertions that the supplier based its assumptions on representations by the distributor and finding no transmittals or guidance by Medicare or CMS specifically concerning the coverage eligibility of Procenta. *See* Exh. MAC-2 at 3-4; *see also* Exh. MAC-6. Importantly, however, the supplier bears the burden of providing sufficient information to establish that the service at issue is covered and the amount of payment due. Act § 1833(e); 42 C.F.R. § 424.5(a)(6). Considering that burden, as well as the fact that Medicare is a defined benefits program, a supplier's liability is not limited simply because there is no explicit provision stating the specific service in question was not covered. Rather, if there were no item/service specific coverage criteria, then the appellant necessarily should have known that the services may not be covered.

Relevant here, there are MPIM provisions that dictate the criteria for assessing coverage when there is no other guidance specifically concerning a service, and the supplier should have known that those criteria were not satisfied. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2 (explaining that such determinations are made by assessing whether the item or service is safe and effective, not experimental or investigational, and appropriate). Therefore, we find the supplier could have been reasonably expected to know that Procenta was not medically reasonable and necessary considering its participation in the Medicare program and access to coverage guidelines explaining the coverage requirements. *See* 42 C.F.R. § 411.406; *see also* CMS (formerly Health Care Financing Administration) Ruling 95-1 (Dec. 22, 1995); MCPM, Ch. 30, §§ 30.2.1–30.2.3.

As discussed above, the medical literature provided by the appellant indicates that this is an emerging field of medical science in which additional research is required. *See, e.g.*, J.D. File 5 at 15-28, 36-65, 67-89. The supplier has not provided medical literature, statements by professional societies, or other evidence that establishes that Procenta is safe and effective, not experimental or investigational, and appropriate for the treatment of the beneficiary's condition. *See* J.D. Record; *see also* M.Y. Record; *see also* MPIM, Ch. 3, § 3.6.2.2. Therefore, the supplier could reasonably have been expected to know that Medicare would not cover Procenta such that its liability is not limited under § 1879 of the Act. Accordingly, we find that the supplier is liable for the non-covered charges.

DECISION

The Council modifies the ALJs' decisions, consistent with the analysis above. Medicare does not cover Procenta (HCPCS code Q4244) or the services billed under CPT code 15271 furnished to the beneficiaries on the dates of service. The supplier remains liable for the non-covered charges.

**MEDICARE APPEALS COUNCIL**

Cecilia Traini
Administrative Appeals Judge

Kaba Kabi A. Kazadi
Administrative Appeals Judge

Date: February 2, 2026

**Attachment A – Beneficiary List**
**Council Docket Nos. M-24-323 & M-24-476**
**Appellant: Family Foot and Leg Center**

| Beneficiary | OMHA Appeal No. | Date of Service | Council Disposition |
|---|---|---|---|
| J.D. | 3-12682582007 | November 23, 2022 | Modify |
| M.Y. | 3-12797782057 | December 9, 2022 | Modify |