**EXHIBIT B-3**

received 3/13/24

Department of Health and Human Services
OFFICE OF MEDICARE HEARINGS AND APPEALS
Cleveland, OH

| | |
|---|---|
| Appeal of: Family Foot and Leg Center | OMHA Appeal No.: 3-12652034947 |
| Beneficiary: L. E[redacted] | Medicare Part: B |
| Medicare No.: [redacted] | Before: Jonathan Eliot<br>Associate Chief Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter an **UNFAVORABLE** decision. Medicare Part B does not cover the skin graft procedure (15271) and Procenta wound covering (Q4244) furnished to the Beneficiary on November 21, 2022. The Appellant is liable for the noncovered services.

## PROCEDURAL HISTORY

The appellant submitted a Medicare Part B claim to First Coast Service Options, the Medicare Administrative Contractor (MAC) with jurisdiction in this case, for skin substitute grafting (15271) and Procenta wound covering (Q4244) furnished to the Beneficiary on November 21, 2022. The MAC denied the claim initially and on redetermination. On further appeal, the Qualitied Independent Contractor (QIC) issued an unfavorable reconsideration decision.

The Office of Medicare Hearings and Appeals (OMHA) subsequently received a request for an Administrative Law Judge (ALJ) Hearing (RFH), which satisfied all applicable jurisdictional requirements. With the request, the appellant waived its right to hearing and requested a decision be issued on-the-record. All Exhibit Files have been admitted to the record and, pursuant to 42 C.F.R. § 405.1038(b), this appeal was decided on the record without an ALJ hearing.

## ISSUES

1. **Whether Medicare Part B covers the skin substitute graft trunk/arm/leg (15271) and Procenta wound covering (Q4244) furnished to the Beneficiary November 21, 2022.**

2. **Whether §1879 of the Social Security Act (the Act) may limit the Beneficiary or Provider's liability with respect to any noncovered services.**

## APPLICABLE LAW AND POLICY

- The Social Security Act (Act) §§ 1831 and 1832 establishes the scope of benefits of the Supplementary Medical Insurance program under Medicare Part B, which provides coverage for a variety of medical services including "medical and other health services."

- The Act § 1861(s) defines "medical and other health services" to include physician's services as well as services and supplies furnished as an incident to a physician's professional service.

- The Act § 1862(a)(1)(A) provides that Medicare Part A or B will not cover items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

- The Act § 1879 of the Act provides that beneficiary and/or provider liability for non-covered Medicare items or services may be limited under particular circumstances.

- The Medicare Program Integrity Manual (MPIM), pub. 100-08, sets forth pertinent policy concerning when an item is reasonable and necessary, including criteria to consider at Ch. 3, section 3.6.2.2. See also MPIM, Ch. 13, §§ 13.5.3 and 13.5.4 for what contractor's consider when creating coverage requirements for LCDs.

- Local Coverage Determination L36377: *Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities* (LCD L36377) (Jan. 2019), published by the MAC with jurisdiction in this case, sets forth coverage criteria for skin substitute grafts.

- Billing and Coding: *Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities* (LCA A57680) (Aug. 2020), published by the MAC with jurisdiction in this case, sets forth additional billing and coding guidance applicable to the services at issue.

## FINDINGS OF FACT AND ANALYSIS

**1. Whether Medicare Part B covers the skin substitute graft trunk/arm/leg (15271) and Procenta wound covering (Q4244) furnished to the Beneficiary November 21, 2022.**

The Appellant seeks Medicare Part B coverage for a skin graft procedure and Procenta wound covering furnished to the Beneficiary on November 21, 2022. Procenta is a placental tissue allograft manufactured by Lucina BioSciences, LLC (Manufacturer), which is used as a wound covering and/or barrier membrane in acute and chronic wounds. (File 11, p. 80.) Procenta is currently registered and marketed as a human cells, tissues, and cellular and tissue-based product (HCT/P). (*Id.*)

As background, the U.S. Food and Drug Administration (FDA) is charged with the regulation of the sale of medical devices and products. In addition to other approval methods, the FDA developed a straight-to—market process for biological matter classified as human cells, tissues, and cellular and tissue-based products (HCT/Ps) under § 361 of the Public Health Service (PHS) Act. This process allows a supplier to take their HCT/P product to market while foregoing the usual 5-10 year approval method that requires clinical trials. The implementing regulations at 21 C.F.R. § 1271 requires that the product be registered on the FDA HCT/P website and meet the following four criteria:

1) The HCT/P is minimally manipulated;
2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
4) Either:
    a. The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
    b. The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
        i. Is for autologous use;
        ii. Is for allogenic use in a first-degree or second degree blood relative; or
        iii. Is for reproductive use.

21 C.F.R. §1271.

It should be noted that registration on the FDA HCT/P website does not constitute proof that a product has been formally vetted by the FDA nor does it constitute a finding by the FDA that a product qualifies as an HCT/P. Unless a manufacturer voluntarily requests product-specific guidance by the FDA's Tissue Reference Group (TRG), HCT/P registered products proceed directly to market without FDA assessment, but are potentially subject to FDA audits to determine whether they meet the criteria for regulation solely under section 361 of the PHS and 21 C.F.R. part 1271.

In this case, the Manufacturer sought and received a recommendation from the Food and Drug Administration's TRG as to whether Procenta meets the criteria for regulation as a HCT/P under section 361 of the Public Health Service (PHS) Act and 21 C.F.R. part 1271. (File 11, p. 81.) The TRG recommendation was favorable, but only when Procenta is used as a cover, to offer protection from the surrounding environment, or to retain fluid. (*Id.*) By contrast, the TRG expressly found that Procenta would not be eligible for regulation under section 361 of the PHS if used for "drawing moisture, 'gliding between two structures,' 'treatment of chronic wounds,' or to 'provide lubrication and cushion'," in that these would constitute a non-homologous use of the placental spongy layer. (*Id.*)

Notably, FDA categorization of a product is a factor in making Medicare coverage decisions, but it is not dispositive. *See* 42 C.F.R. § 405.201(a)(1). Pursuant to statute, Medicare Part B beneficiaries are entitled to coverage of "medical and other health services," which is further defined in such a way as to include physician's services as well as services and supplies furnished incident to a physician's professional service. *See* Act §§ 1832(a), 1861(s)(1)-(2)(A). However, to be covered by Medicare, items or services must be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act§ 1862(a)(1)(A).

For the purpose of specifying whether an item or service is reasonable and necessary for Medicare coverage purposes, CMS issues national coverage determinations (NCDs). *See* MPIM, ch.3, §3.6.2.2. In the absence of an NCD, Medicare contractors are responsible for determining

whether services are reasonable and necessary. (*Id.*) Specifically, contractors shall determine and describe in a local coverage determination (LCD) the circumstances under which the item or service is reasonable and necessary under § 1862(a)(1)(A) of the Act. *See* MPIM, ch 13, §13.5.4. However, if no LCD exists for a particular item or service, the MACs, CER, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    - Ordered and furnished by qualified personnel; and
    - One that meets, but does not exceed, the beneficiary's medical need.

MPIM, ch.3, § 3.6.2.2.

In this case, there is no applicable NCD relating to the services at issue nor does the MAC with jurisdiction have an LCD directly applicable to the use of Procenta. Notably, the MAC published LCD L36377: *Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities* (LCD L36377) (Jan. 2019), which was effective on the date of service. The LCD expressly contemplates coverage criteria for skin substitute grafts including those substitutes regulated by FDA as an HCT/P. However, by virtue of the LCD's title and its content, the LCD addresses coverage for skin substitutes used for treatment of chronic wounds, not for wound coverings or barriers. Moreover, the Limitations section of LCD L36377 states, "[o]ne specific skin substitute graft product will be allowed for the episode of skin replacement surgery wound care…<u>assuming its use is not in conflict with FDA assessments</u> and assuming there is one related wound (emphasis added)."

As discussed above, the FDA TRG reached a finding that chronic wound treatment falls outside of Procenta's homologous use. Use of Procenta for chronic wound treatment would therefore conflict with the FDA's assessment. Accordingly, and to the extent that it was used in this case for chronic wound treatment, the Procenta claim at issue would not be covered under LCD L36377. In the alternative, to the extent that Procenta was used as a wound covering in this case, I find that LCD 36377 would not apply.

Absent an applicable NCD or LCD, the Appellant has the burden to show the requirements under MPIM, ch. 3, § 3.6.2.2 have been satisfied. With this set of criteria in mind, the Appellant's Request for ALJ Hearing argues that the use of Procenta in this case was safe, effective, and not experimental. (File 1, pp. 6-8.) Specifically, the Appellant references the FDA's TRG letter validating Procenta's homologous use as a wound covering to retain moisture. (*Id.*) The

Appellant also refers to multiple peer-reviewed studies to support the application of Procenta to wounds. (*Id.*; See also, File 11, pp. 96-138; File 3, pp. 2-175). The Appellant also references favorable C2C Solutions that had been issued on Procenta claims unrelated to the claim at issue. (File 1, pp. 6-8.) Finally, the Appellant cites to an email exchange between a Monica McKenzie, from First Coast Service Options, and Lisa Borscha, from Extremity Care, concerning a request for clarification of recent claim rejections. (*Id.*)

Upon full consideration of the Appellant's arguments and evidence of record, I conclude that Medicare Part B does not cover the Procenta graft at issue. In this case, the Beneficiary presented to the Appellant on November 21, 2022 for follow up wound care. (File 11, p. 16.) The Operative Report section includes a "Pre-Op Diagnosis," which indicates, "[d]ifficult traumatic ulceration not responding to conservative treatment of sharp surgical debridements and offloading as well as [antibiotics] by urgent care center for at least 4 weeks to no avail, advanced tissue graft is required at this time [with] growth factors to aid in limb salvage. Last visit procenta to much avail." (Id. at p. 22.) The Assessment/Plan section of the same record states, "[w]ound improving [with] procenta growth factors." (Id. at p. 24.)

Notwithstanding the Appellant's brief statement in the RFH that Procenta was used on the date of service as a wound covering, the portions of the clinical note cited above reflect a patient with a chronic leg wound that had been nonresponsive to conservative therapies. The Operative Report and related Assessment/Plan sections discuss the use of Procenta in terms that strongly suggest an intent to perform chronic wound treatment and not the more limited purpose of wound covering or moisture retention.

With no other clinical evidence or testimony on record to clarify the purpose it served, or to corroborate the Appellant's statement in the RFH, I am compelled to conclude that Procenta was used for chronic wound treatment in this case. Accordingly, the application of Procenta at issue constituted a non-homologous use that was at odds with its regulation by FDA as an HCT/P. The non-homologous of Procenta in this case is therefore a factor that ultimately suggests the product was used in a manner that was experimental and investigational and not safe and effective.

As previously noted, FDA categorization of a product is a factor in making Medicare coverage decisions, but it is not dispositive. *See* 42 C.F.R. § 405.201(a)(1). However, the Appellant's peer reviewed literature fails to support the Appellant's claim that the use of Procenta for wound treatment was safe and effective and not experimental.

One article, entitled "Use of Novel Placental-derived, Conformed Allograft in the Treatment of Non-Healing Chronic Wounds," provides a brief, single-patient case study using Procenta in the treatment of an 81-year-old male with a chronic diabetic foot ulcer. (File 11, pp. 85-87.) There is no indication that this case study was peer reviewed or was part of a definitive randomized clinical trial. Accordingly, I afford this study little weight in evaluating the coverage criteria at MPIM, ch.3, § 3.6.2.2.

Additional articles submitted by the Appellant discuss *in vitro* and *in vivo* experiments related to wound healing, the use of biomarkers to identify patients for whom bio-marker-guided approaches may aid in wound healing, the success of naturally derived extracellular matrix scaffolds in the process of tissue remodeling, the fundamental role of extracellular matric components in the wound healing process, and the therapeutic potential for amniotic membrane grafts for wound healing. (File 11, pp. 88-138; File 10, pp. 24-37.) None of these studies discuss the Procenta product, nor do they specifically evaluate the safety and efficacy of Procenta for the

purpose of chronic wound treatment. Accordingly, I afford these articles little weight in evaluating the coverage criteria at MPIM, ch.3, § 3.6.2.2.

The final study is a technical brief submitted by the ECRI Institute-Penn Medicine Evidence-Based Practice Center to the Agency for Healthcare Research and Quality's Technology Assessment Program. (File 3.) The brief describes skin substitute products commercially available in the United States used to treat chronic wounds. (*Id.* at p. 10.) It also evaluated associated randomized controlled trials associated with the products, and it suggested best practices for future studies. (*Id.*) Notably, the brief finds a lack of studies examining the efficacy of most skin substitute products and the need for better-designed and reported studies providing more clinically relevant data. (*Id.*) More importantly, it does not mention the Procenta product, nor does it evaluate the safety and efficacy of Procenta for the purpose of chronic wound treatment. (*Id.*) Accordingly, I afford these articles little weight in evaluating the coverage criteria at MPIM, ch.3, § 3.6.2.2.

In addition to the aforementioned studies, the Appellant also references multiple favorable C2C Solutions that had been issued on Procenta claims unrelated to the claim at issue. (File 1, pp. 6-8.) These C2C decisions have no evidentiary weight or applicability to this appeal. As a preliminary point, QIC reconsideration decisions have no precedential effect and are not binding if a subsequent ALJ or attorney adjudicator decision is issued on the claim. *See* 42 C.F.R. §405.978. Moreover, and pursuant to regulation, the ALJ has de novo review authority of the claim appeal and based the decision on the evidence in the administrative record. See 42 C.F.R. §405.1000(d).

Finally, the Appellant cites to an email exchange between a Monica McKenzie, from First Coast Service Options, and Lisa Borscha, from Extremity Care, concerning a request for clarification of recent claim rejections. (File 1, pp. 6-8.) The email discusses unspecified processing system updates that were implemented to prevent skin substitute claim rejection involving code Q4244 and codes 15271-15278. (*Id.* at p. 8.) This email has no evidentiary weight or applicability to this appeal. The email not only fails to supersede the legal authorities discussed in this decision, but it expressly states "[p]lease keep in mind, for any service reported to Medicare, it is expected that the medical record documentation clearly demonstrates that the service meets all reasonable and necessary criteria." (*Id.*) Accordingly, the email expressly does not speak to whether any particular item or service will be covered.

Upon full consideration of the foregoing evidence, I find that the Appellant has failed to establish by a preponderance of the evidence that Procenta is safe and effective and not experimental or investigational when used for wound treatment. The submitted studies either fail to address Procenta's safety and efficacy with respect to wound treatment or, in one case, fails to amount to a persuasive peer reviewed study or a definitive randomized clinical trial. Given the little weight afforded by this evidence, and the fact that the Procenta application at issue constituted a non-homologous use at odds with its regulation by FDA as an HCT/P, I am compelled to conclude that the Appellant has failed to satisfy the coverage criteria at MPIM, ch.3, § 3.6.2.2. Accordingly, Medicare Part B does not cover the Procenta wound covering pursuant to §1862(a)(1)(A) of the Act. Moreover, because the use of Procenta is noncovered, Medicare Part B does not cover the related skin substitute grating procedure pursuant to §1862(a)(1)(A) of the Act.

**2. Whether §1879 of the Act may limit the Beneficiary or Provider's liability with respect to any noncovered services.**

Because the product is excluded from Medicare coverage under § 1862(a)(1)(A) of the Act, a liability determination is necessary pursuant to § 1879 of the Act. In order for financial liability to be limited pursuant to § 1879, both the Beneficiary and the Provider must be found to have not known, and to have not reasonably been expected to know, that payment would not be made for such product under the Medicare program.

Here, there is no Advance Beneficiary Notice or any other indication in the record that the Beneficiary knew or could have been reasonably expected to know that the product in question would be excluded from coverage. However, the Appellant must reasonably be expected to have known Medicare payment would not be made for the services given its constructive notice of Medicare statute, regulation, and CMS coverage policy. Therefore, Medicare payment may not be made under § 1879 of the Act, and the Appellant's liability is not limited by this section.

## CONCLUSIONS OF LAW

Pursuant to §1862(a)(1)(A) of the Act, Medicare Part B does not cover the skin graft procedure (15271) and Procenta wound covering (Q4244) furnished to the Beneficiary on November 21, 2022.

Pursuant to §1879 of the Act, the Appellant is liable for the noncovered services.

## ORDER

For the reasons discussed above, this decision is **UNFAVORABLE**. I direct the Medicare Administrative Contractor to process the claim in accordance with this decision.

**SO ORDERED**

Jonathan Eliot
Associate Chief Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)