UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FAMILY FOOT AND LEG CENTER, PA,

Plaintiff,

v. Case No. 2:26-cv-43-SPC-DNF

ROBERT F. KENNEDY, JR., Secretary of the United States Department of Health and Human Services; and DR. MEHMET OZ, Administrator for the Centers for Medicare and Medicaid Services,

Defendants.
_______________________________________/

**PLAINTIFF'S OPENING BRIEF**

EDWARD L. LARSEN, ESQ., P.A.

By: */s/ Edward L. Larsen*
Edward L. Larsen, Esq.
Counsel for Plaintiff
Florida Bar No.: 16700
The Chamber Building
2390 Tamiami Trail N., Suite 202
Naples, Florida 34103
(239) 643-0100
Ed@EdwardLarsenEsq.com

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................ 2
TABLE OF AUTHORITIES ........................................ 2
STATEMENT OF RELIEF REQUESTED ........................................ 3
STATEMENT OF BASIS FOR REQUEST ........................................ 3
STATEMENT OF JURISDICTION ........................................ 3
STATEMENT OF FACTS ........................................ 4
STANDARD OF REVIEW ........................................ 7
ARGUMENT ........................................ 9
1) LCD L36377 is Applicable to Extend Medicare Coverage ........................................ 9
2) The Services Rendered Were Medically Necessary ........................................ 15
3) The Limitation Of Liability Provisions Alleviate Plaintiff's Liability ........................................ 18
CONCLUSION ........................................ 24
CERTIFICATE OF SERVICE ........................................ 25

## TABLE OF AUTHORITIES

Page

*Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985) ........................................ 7
*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................ 8
*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................ 7
*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................ 8
*Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151 (9th Cir. 2012) ........................................ 8
*Pollard v. Halter*, 377 F.3d 183 (2d Cir. 2004) ........................................ 8
*Richardson v. Perales*, 402 U.S. 389 (1971) ........................................ 7
*Sternberg v. Sec'y, Dep't Health & Human Servs.*, 299 F.3d 1201 (10th Cir. 2002) ........................................ 7
*TNS, Inc. v. NLRB*, 296 F.3d 384 (6th Cir. 2002) ........................................ 7
*Tome v. Schweiker*, 724 F.2d 711 (8th Cir. 1984) ........................................ 7
*Yale-New Haven Hosp., Inc. v. Thompson*, 162 F. Supp. 2d 54 (D. Conn. 2001) ........................................ 20

## STATEMENT OF RELIEF REQUESTED

Plaintiff respectfully requests that the District Court reverse the Secretary's four (4) final agency orders issued by the Medicare Appeals Council, in the following Office of Medicare Hearings and Appeals (OMHA) cases (collectively, the "Final Orders"):

i. OMHA Appeal Case No. 3-12532508877 (Docket No. M-24-3000) (Beneficiary G.M.);
ii. OMHA Appeal Case No. 3-12656964257 (Docket No. M-24-2873) (Beneficiary L.E.);
iii. OMHA Appeal Case No. 3-12652034947 (Docket No. M-24-2874) (Beneficiary L.E.); and
iv. OMHA Appeal Case No. 3-12682582007 (Docket No. M-24-343) (Beneficiary J.D.) consolidated with OMHA Appeal Case No. 3-12797782057 (Docket No. M-24-476) (Beneficiary M.Y.)

In each appeal CMS alleges that it overpaid Plaintiff for the administering Procenta® skin substitute allografts for treatment of non-healing wounds and associated physician/administration services. CMS seeks to recoup money paid for those claims with interest thereon. Here, Plaintiff seeks reversal of the Final Orders and payment of its fees for services rendered to Medicare beneficiaries from CMS.

## STATEMENT OF BASIS FOR REQUEST

Plaintiff, having exhausted the administrative appeal process pursuant to 42 C.F.R. Part 405, seeks District Court review of the Final Orders identified above, each of which constitutes a final agency action, in accordance with 42 C.F.R. § 405.1877.

## STATEMENT OF JURISDICTION

This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.,* and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* This Court has

jurisdiction pursuant to 42 U.S.C. § 1395ff, which authorizes judicial review by the Court of a final agency decision of the Secretary of the United States Department of Health and Human Services (HHS). The amount in controversy exceeds the threshold dollar amount set forth in 42 U.S.C. §§ 1395ff(b)(1)(E)(i) and 1395ff(b)(1)(E)(iii).

**STATEMENT OF FACTS**

Plaintiff, FAMILY FOOT AND LEG CENTER, PA (hereinafter "FFLC") is a podiatry medical practice with its principal place of business in Naples, Florida. (AR Vol. 1, 44-46). In 2022, FFLC provided treatment to four (4) Medicare patients (G.M., L.E., J.D., and M.Y.) with Procenta® (HCPCS code Q4244), an acellular, human placental-derived allograft, which FFLC applied as a skin substitute wound covering, and billed Medicare accordingly, together with the associated physician / administration services (CPT codes 15271 and 15275). *See generally* AR Vol. 1, 1 – 14; Vol. 2, 1 – 14; Vol. 3, 1 – 14; Vol. 4, 1 – 16; Vol. 5, 1-16.

The Medicare Administrative Contractor ("MAC"), First Coast Service Options, Inc. ("FCSO"), denied Medicare coverage for each of the claims at issue. FFLC timely requested a redetermination for each denial. FCSO once again declined coverage, concluding that Procenta was not covered as a skin substitute graft. *See* AR Vol. 1, 278-286, 462-471; Vol. 2, 586-589; Vol. 3, 558-567; Vol. 4, 950-959.

FFLC timely requested reconsideration with CMS's assigned Qualified Independent Contractor ("QIC"), C2C Innovative Solutions, Inc. ("C2C"). C2C returned unfavorable reconsideration decisions, concluding that Procenta is not approved by the FDA, is not safe and effective, is investigational or experimental, and

is not medically necessary. *See* AR Vol. 1, 267-276; Vol. 2, 276-284; Vol. 3, 262-270; Vol. 4, 528-536; Vol. 5, 237-245. FFLC asserts that C2C failed to address the applicability of LCD L36377, Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers.

FFLC timely filed Requests for Hearing by an Administrative Law Judge ("ALJ") with the Office of Medicare Hearings and Appeals (OMHA), contesting each of C2C's unfavorable decisions. *See* AR Vol. 1, 64-66; Vol. 2, 82-93; Vol. 3, 75-82; Vol. 4, 985-992; Vol. 5, 262-266.

On March 14, 2024, ALJ Lewis T. Booker, Jr. issued an unfavorable decision in OMHA Appeal Case No. 3-12532508877 (AR Vol. 1, 39-43). In his decision, ALJ Booker found that Procenta was not "furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition" and that it was "an investigational use." *Id.* at 42. He further found that the physician service code "is not supported as no 'skin substitute graft' was actually applied," and that FFLC is not entitled to a limitation on its liability because it "is presumed to have actual or at the very least constructive knowledge because of its receipt of CMS notices, or its knowledge of what are considered acceptable standards of practice by the local medical community." *Id.* at 43.

On March 4th and 8th, 2024, ALJ Jonathan Eliot issued unfavorable decisions in OMHA Appeal Case Nos. 3-12656964257 (AR Vol. 2, 55-61) and 3-12672034947 (AR Vol. 3, 28-34). The ALJ found that FFLC failed to establish Procenta was "safe and effective and not experimental or investigational when used for wound

treatment," and FFLC "must reasonably be expected to have known Medicare payment would not be made for the services given its constructive notice of Medicare statute, regulation, and CMS coverage policy." AR Vol. 2, 60 and Vol. 3, 33.

On September 6th and November 7th, 2023, ALJ Mark Lacedonia issued unfavorable decisions in OMHA Appeal Case Nos. 3-12682582007 (AR Vol. 4, 163-169) and 3-12797782057 (AR Vol. 5, 36-39). The ALJ found that FFLC failed to comply with section 351 of the Public Health Service (PHS) Act, "as the documentation submitted does not show that the FDA has approved Procenta as safe and effective for the treatment at issue in this matter, the use of Procenta does not meet Medicare medical necessity requirements and must remain denied." AR Vol. 4, 168; and Vol. 5, 38. Contrary to the clinical records, the ALJ decided that "[t]he application of Procenta does not qualify as application of a skin substitute graft as this code is not to be reported for application of a liquid or gel non-graft wound dressing." Finally, the ALJ refused to limit FFLC's liability pursuant to Section 1879(a) of the Act. *Id.*

FFLC timely requested Medicare Appeals Council review of each of the ALJ decisions. AR Vol. 1, 31-37; Vol. 2, 40-50; Vol. 3, 36-41; Vol. 4, 21-25; Vol. 5, 43-44.

Between November 10, 2025 and February 2, 2026, the Council issued four (4) unfavorable decisions affirming the denials of coverage: Docket No. M-24-3000 (11/10/2025; AR Vol. 1, 1 – 14); Docket No. M-24-2873 (11/14/2025; AR Vol. 2, 1 – 14); Docket No. M-24-2874 (01/23/2026; AR Vol. 3, 1 – 14); and Docket Nos. M-24-343 & M-24-476 (02/02/2026; AR Vol. 4, 1 – 16; and AR Vol. 5, 1-16). These four (4) decisions constitute CMS's "Final Orders" of which FFLC seeks judicial review.

## STANDARD OF REVIEW

The Court's review of these Final Orders is limited to: (i) whether the Secretary's factual findings were supported by substantial evidence; (ii) whether the Secretary applied the proper legal standards; and (iii) whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A); and *Sternberg v. Sec'y, Dep't Health & Human Servs.*, 299 F.3d 1201, 1205 (10th Cir. 2002) (holding that the substantial evidence test is substantively the same as the review for arbitrariness or caprice).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(internal quotation marks omitted).

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412-413 (2024), the United States Supreme Court held that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires … But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."

The court's review "is not a rubber stamp for the Secretary's decision and involves more than a search for evidence supporting the Secretary's findings. [The Court] must scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the Secretary's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985)(citing *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984)); *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002)(it is not enough merely to

verify that there is evidence to support the Board's determination without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn). *See also* APA, 5 U.S.C. § 706(2)(E) (Scope of Review).

The Secretary's conclusions of law as to Medicare coverage are reviewed *de novo*, and failure to apply the correct legal standard is grounds for reversal. *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

Pursuant to the Administrative Procedure Act ("APA"), the Secretary's final decision may also be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1159 (9th Cir. 2012). To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

In reviewing the explanation for the decision, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

An agency has acted arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See State Farm*, 463 U.S. at 43.

## ARGUMENT

### 1) LCD L36377 Is Persuasive As To Medicare Coverage

With respect to Medicare coverage, National Coverage Determinations (NCDs) are determinations by CMS regarding whether a particular item or service is covered (or not covered) nationally under Medicare and they are binding on the Defendants and their contractors. As defined in §1869(f)(2)(B) of the Act, Local Coverage Determinations (LCDs) are determinations by MACs regarding whether or not a particular item or service is covered on a contractor-wide basis in accordance with the "reasonable and necessary" standard in §1862(a)(1)(A) of the Act. LCDs are afforded substantial deference in determination of Medicare coverage.

Only in the absence of a controlling NCD or LCD, would Medicare contractors institute a claim-by-claim review to determine whether a claim meets the reasonable and necessary criteria outlined under section 1862(a)(1)(A) of the Social Security Act, as well as any other applicable requirements for coverage payment in any statute, regulation, or guidance document. *See* Medicare Program Integrity Manual, CMS Pub. 100-08, Ch. 3, §§ 3.3.3, and 3.6.2.2 (Rev. 13821, Effective June 9, 2026).

In 2015, CMS issued LCD L36377 titled "Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities." LCD L36377 "addresses the reasonable and necessary (R&N) threshold for coverage of skin replacement surgery with particular emphasis on the indications for applications of skin substitute grafts for diabetic foot ulcers (DFU) and venous leg ulcers (VLU)."

LCD L36377 sets forth the elements for Medicare coverage, including requirements for a period of prior failed conservative treatment and appropriate documentation. Therefore, CMS has indeed published written guidance allowing for Medicare coverage of Procenta type skin substitute allografts, under LCD L36377.

LCD L36377 specifically states that products regulated by the FDA as human cells, tissues, and cellular and tissue-based products (HCT/Ps) (such as Procenta), are covered and are eligible for Medicare reimbursements. CMS simply did not afford LCD 36377 the requisite deference required. Therefore, CMS erred in not deferring to this LCD and conducting an independent claim assessment for medical necessity.

In the four (4) Final Agency Orders, the Appeals Council refused to give any deference, whatsoever, to LCD L36377 by "quote mining" the beneficiaries' medical records and, without any evidence, claiming that Procenta is not a skin substitute allograft, but rather a "non-graft wound dressings (*e.g.* gel, ointment, foam, liquid)." *See* AR Vol. 2, 7-8; Vol. 3, 8; and Vol. 4, 168.

According to the FDA's Tissue Reference Group (TRG) letter dated August 19, 2020, Procenta is described as a product consisting of the "intermediate layer, also referred to as the spongy layer, of the amniotic sac which has been mechanically separated from the amnion and/or chorion…." (AR Vol. 1, 326-327; Vol. 2, 385-386).

In its CPT Code application, Procenta is specifically described as an "acellular, sterile, human placental-derived allograft. It is indicated to treat chronic non-healing wounds," and "[w]hen Procenta is placed in the wound bed, it acts as a hydrophilic extracellular matrix scaffold…." (AR Vol. 2, 412). Consequently, it is clear that

Procenta is a skin substitute allograft and not a "non-graft wound dressing." Therefore, the Appeals Council erred by denying coverage to FFLC in light of LCD L36377.

The Appeals Council also incorrectly claimed that because the medical records reference "amniotic membrane/injection," Procenta may have been applied via injection, therefore falling outside of the purview of LCD L36377. *See* AR Vol. 1, 11; AR Vol. 2, 8; and Vol. 3, 8. For beneficiaries J.D. and M.Y., the Appeals Council simply ignored LCD L36377 altogether. AR Vol. 4, 3-16; Vol. 5, 3-16. Other than a part of a generic billing code itself there is no evidence of an injection.

Likewise, the Council ignored the fact that there were no corresponding injection CPT codes submitted by FFLC for the claims. Should FFLC have administered Procenta via injection, a claim for CPT 20605 (arthrocentesis, aspiration and/or injection, intermediate joint or bursa, without ultrasound guidance), 96372 (Injection of drug/substance under skin or into muscle), or similar injection codes would have been billed. Rather, the CPT 15271 ("Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds") was correctly billed. AR Vol. 3, 449-450. The absence of injection administration codes effectively undermines the Council's assertion that Procenta was injected into the patients.

The following review of patient records also affirms that each claim submitted satisfied the LCD L36377 billing requirements and is duly payable by Medicare.

For Appeal Case No. 3-12532508877, beneficiary G.M. was then a sixty-eight (68) year old female patient who presented to FFLC with a right foot infection and full thickness ulcerations. AR Vol. 1, 290-294. The ulcer was documented as a "full

thickness ulceration plantar hallux right foot with significant edema, pus, odor and erythema to the right hallux - 0.2cm x 0.2cm x 0.1cm" with "faintly palpable pulses." *Id.* at 292. The patient's medical history was significant for osteoarthritis of her ankles and feet and was immunocompromised due to chemotherapy secondary to "left great cancer to her spine/bone." She had been on a six-week course of doxycycline and cefdinir antibiotics prescribed by her infectious disease specialist. *Id.* at 294. Based on the patient's presentation and prognosis, it was determined that it was medically necessary and reasonable to utilize a skin substitute graft (*i.e.* Procenta), to form a scaffolding to promote wound healing, potentially salvage the limb, and avoid further complications. *Id.* at 293. Notably, the medical records contain an operative report for "Procenta Amniotic membrane / placement by Forthright to cover up to 6 sq cm Q4244 1 units per 6 cm square coverage per Graft." *Id.* at 293. Procenta was applied via the usual steps and protocols. The usual steps for Procenta application are to remove the product from the vial and apply Procenta evenly over the surface of the wound and then cover the wound site with a non-adherent, impregnated dressing. Procenta Application, Lucina Sciences, *available at* https://lucinabio.org/our-products (last visited October 14, 2026). These steps were documented by FFLC in the patient's records. AR Vol. 1, 290-294. Consequently, the patient's condition, presentation, and prognosis all fall squarely within the purview of L36377.

For Appeal Case Nos. 3-12656964257 and 3-12652034947, beneficiary L.E. was an eighty-seven (87) year old female suffering from a Grade 3 ulcer to the left lower leg for more than four weeks. AR Vol. 2, 422; and AR Vol. 3, 437. On examination,

the ulcer measured at 3cm x 2cm x 1mm on November 14, 2022 (AR Vol. 2, 422) and 2cm x 1.5cm x 1mm on November 21, 2022 (AR Vol. 3, 435). It was documented that the wound was a "Difficult Traumatic ulceration not responding to conservative treatment of sharp surgical debridement, abx, and 2x a week wound care at urgent care as well as daily wound care by the patient for at least 4 weeks to no avail, advanced tissue graft is required at this time [with] growth factors to aid in limb salvage." AR Vol. 2, 422. It was determined that it was medically necessary and reasonable to utilize a skin substitute allograft to promote wound healing and salvage the affected limb. The operative report details the "Procenta Amniotic membrane / placement by Forthright to cover up to 6 sq cm Q4244 1 units per 6 cm square coverage per Graft." *Id.* Procenta was applied via the usual steps and protocols, according to manufacturer's specifications. As noted, *supra*, nothing in the medical records indicates that Procenta was applied via injection. AR Vol. 2 at 420-427; and Vol. 3, 423-450.

For Appeal Case No. 3-12682582007, beneficiary J.D. was an eighty-two (82) year old male patient. AR Vol. 4, 684-825. He first presented to FFLC on July 22, 2022, after sustaining a traumatic injury to his left shin on July 9, 2022. AR Vol. 4, 769. After treatment by his primary care physician and his dermatologist, he was referred to FFLC for specialized wound care. On the July 22, 2022 visit, the wound was excised, cleaned, and dressed. AR Vol. 4, 771. Instructions were given to the patient's home nurse regarding daily dressing change and ace wrap compression. Beneficiary J.D. returned to FFLC on August 23, 2022 for a follow up. *Id.* at 789. On examination, the wound measured at 6.0cm x 3.0cm x 0.1cm. *Id.* at 791. The wound

was described as "[l]arge dissecting hematoma noted L anterior leg resolved, now healing as a grade III to subQ wound prior was down to muscle." *Id* at 791.

On November 23, 2022, beneficiary J.D. presented to FFLC for continued wound care. *Id.* at 799. On examination, the wound was noted on the left leg as "Wagner Grade III to the level of subcutaneous tissue fibrotic/hypergranular base and with moderate drainage with size of 5cm x 3cm with mild erythema but no CSI noted." *Id*. at 807. It was documented that the persisting ulcer wound "would benefit from the use of [Procenta] in office for limb salvage with use of growth factors in this graft. The amniotic membrane use is medically necessary for that patient's treatment goal and proper healing to avoid complications." The operative report details the "Procenta Amniotic membrane/placement by Forthright to cover up to 6 sq cm Q4244 1 units per 6 cm square coverage per Graft." *Id*. Procenta was applied via the usual steps and protocols and according to manufacturer's specifications. Nothing in the patient's medical records indicates that Procenta was administered via injection. *Id.* at 799-826.

For Appeal Case No. 3-12797782057, beneficiary M.Y. was a seventy-seven (77) year old female patient suffering from multiple Grade III venous ulcers on the right leg. (*See* AR Vol. 5, 620-627). Her medical history was significant for peripheral vascular disease with vein stripping and venous ablation. *Id.* at 624. The ulcer had been treated with "greater than 20mmHG compression therapy for more than 4 wks prior to grafting and failed conservative care for 4 wks prior to initial application of this graft." *Id.* at 623. She was also on a course of Ciprofloxacin antibiotics. *Id.* at 621. On examination, the ulcer measured at 5mm x 8mm x 2mm with a moist fibrogranular

wound bed with slight serous drainage. *Id.* at 623-624. Grade III Wagner to the layer of subcutaneous tissue. *Id.* at 624. It was deemed medically necessary and reasonable to utilize a skin substitute allograft to treat this wound. *Id.* Specifically, Procenta was chosen "due to the chronicity of the wound, and concern for an underlying cellular growth component that is preventing the wound from healing. The amnion derived product plus an extra cellular matrix along with sharp debridement and removal of necrotic tissue of the wound should help address this." *Id.* at 623. The operative report details the "Procenta Amniotic membrane / placement by Forthright to cover up to 6 sq cm Q4244 1 units per 6 cm square coverage per Graft." *Id.* Procenta was applied via the usual steps and protocols and according to manufacturer's specifications. Again, nothing in the medical records reflects that Procenta was administered via injection. *Id.* at 620-627.

Considering that LCD L36377 is applicable to each of these claims, the Appeals Council erred by independently assessing reasonableness and medical necessity in derogation of the LCD. The medical records also demonstrate that all the elements of LCD L36377 were satisfied. Therefore, each claim submitted was properly payable.

**2) The Services Rendered Were Medically Necessary**

Even if the Appeals Council was entitled to independently conduct a medical necessity and reasonableness inquiry, it erred by ignoring the FDA's advisory opinion and in its selective parsing of FFLC's medical literature to justify the claim denials. In the FDA's TRG advisory opinion, Procenta was explicitly permitted "to serve as a cover, to offer protection from the surrounding environment, or to retain fluid[.]"

FFLC submitted uncontroverted clinical evidence that Procenta was indeed used as a protective barrier, a wound covering, and to retain moisture to promote wound healing. Thus, the application of Procenta to these beneficiaries' wounds falls squarely within the prescribed use as "Human Cells, Tissues, and Cellular and Tissue-Based Products" (HCT/P), regulated under § 361 of the Public Health Service (PHS) Act. There is no evidence in the administrative record which suggests that Procenta was applied to these beneficiaries' wounds in any other manner, including by injection.

While FDA approval / exemption is not outcome-determinative in respect to Medicare coverage, it is substantial evidence of the applicable standard of care. It was plain error for the Appeals Council to decide the issue of coverage counter to the plain language of the TRG's advisory opinion and LCD L36377 and to make its medical necessity and reasonableness determination without supporting, substantial evidence.

FFLC also submitted authoritative medical literature attesting to the safety and effectiveness of placental derived skin substitutes for treatment of wounds. AR Vol. 1, 69 – 266, 308-321, 329-382, 404-457; and Vol. 4, 26-149. Most importantly, the Technology Assessment Program – Technical Brief, Skin Substitutes for Treating Chronic Wounds, commissioned by the Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services ("Technical Brief") states that "[i]f chronic wounds fail to respond to standard of care, skin substitutes may be used as an adjunct to establish chronic wound care methods to increase the likelihood of complete healing." AR Vol. 1, 82. These researchers have concluded that skin substitutes have functional and structural characteristics that closely match those of autologous skin:

"[t]he ideal skin substitute should be durable, completely autologous, endothelialized and contain adnexal structures and adult stem cells. Other authors have stated that commercially manufactured skin substitutes should protect the integument from water loss and infection; provide a stable, biodegradable scaffold to promote the synthesis of new dermal tissue; allow host or other cells to proliferate within the scaffold that will act as functional dermal call rather than scar tissue; and resisting tearing forces while being easy to handle." *Id.* at 82-83. "Eweida and Marei have suggested that growth factors and ECM components of the skin substitute may promote cell proliferation, reduce wound degradation caused by MMPs within the wound, and promote wound vascularization. The skin substitute properties these authors have noted may enhance a skin substitute's wound healing potential beyond that of standard of care." *Id.* at 83.

Commercially manufactured skin substitutes: (a) protect the integument from water loss and infection; (b) provide a stable, biodegradable scaffold to promote the synthesis of new dermal tissue; (c) allow host or other cells to proliferate within the scaffold that will act as functional dermal cells rather than scar tissue; and (d) resist tearing forces while being easy to handle. *Id.* at 82-83.

It is further suggested that growth factors and extracellular matrix (ECM) components of the skin substitute: (a) may promote cell proliferation; (b) reduce wound degradation caused by matrix metalloproteinase (MMP) within the wound; and (c) promote wound vascularization. *Id.* at 83.

Within the Technical Brief, several placenta-derived wound covering products with identical components as Procenta were identified as appropriate skin substitutes

for treating chronic non-healing wounds. *Id.* at 89-92. Procenta, likewise, qualifies as a skin substitute and falls squarely within the purview of LCD L36377.

Notably, FFLC submitted uncontroverted evidence in the form of a physician affidavit attesting that the use of Procenta to promote wound healing is consistent with the standards of care in the local medical community and that many other physicians in the community also regularly utilize Procenta or other placenta-derived products for treatment of similar wound conditions. AR Vol. 1, 44-46.

Each beneficiary's clinical records on file also establish that FFLC adhered to the applicable standard of care in utilizing Procenta as a skin substitute after more conservative treatments failed. AR Vol. 1, 289 – 295; Vol. 2, 420-427; Vol. 3, 423-450; Vol. 4, 799-826; Vol. 5, 620-627. Based on each beneficiary's diagnosis, history, presentation, and treatment course, it was medically reasonable and necessary for FFLC to utilize a skin substitute allograft to promote wound healing and to prevent deterioration of the wound conditions.

It was inappropriate for CMS, which lacked first-hand knowledge of the beneficiaries' medical history, conditions, presentations, and the applicable standard of care, to substitute its judgment for that of FFLC's treating physicians. CMS's conclusion that FFLC's use of Procenta fell outside of the requisite standard of care is not supported by the administrative record for each claim.

**3) The Limitation of Liability Provisions Alleviate Plaintiff's Liability**

Section 1879 of the Act allows for a limitation of liability (LOL) where a provider of services did not know, and could not reasonably have been expected to

know, that payment would not be made for such services. In accordance with regulations at 42 C.F.R. § 411.406, evidence that a provider did, in fact, know or should have known that Medicare would not pay for an item or service include:

> **§ 411.406** Criteria for determining that a provider, practitioner, or supplier knew that services were excluded from coverage as custodial care or as not reasonable and necessary.
>
> (a) *Basic rule.* A provider, practitioner, or supplier that furnished services which constitute custodial care under § 411.15(g) or that are not reasonable and necessary under § 411.15(k) is considered to have known that the services were not covered if any one of the conditions specified in paragraphs (b) through (e) of this section is met.
>
> (b) *Notice from the QIO, intermediary or carrier.* The QIO, intermediary, or carrier had informed the provider, practitioner, or supplier that the services furnished were not covered, or that similar or reasonably comparable services were not covered.
>
> (c) *Notice from the utilization review committee or the beneficiary's attending phyician.* The utilization review group or committee for the provider or the beneficiary's attending physician had informed the provider that these services were not covered.
>
> (d) *Notice from the provider, practitioner, or supplier to the beneficiary.* Before the services were furnished, the provider, practitioner or supplier informed the beneficiary that—
>
> (1) The services were not covered; or
>
> (2) The beneficiary no longer needed covered services.
>
> (e) *Knowledge based on experience, actual notice, or constructive notice.* It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following:

> (1) Its receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO.
>
> (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service.
>
> (3) Its knowledge of what are considered acceptable standards of practice by the local medical community.

[54 FR 41734, Oct. 11, 1989, as amended at 60 FR 48425, Sept. 19, 1995]

Courts have emphasized that the inquiry should focus on whether providers knew of widely-published CMS materials governing Medicare coverage and whether the provider has received "conflicting information" concerning coverage eligibility *Yale-New Haven Hosp., Inc. v. Thompson*, 162 F. Supp. 2d 54, 68 (D. Conn. 2001).

In an analogous case from the Southern District, *Advanced Diabetes Treatment Centers, L.L.C. v. Sebelius*, No. 09-61698, 2011 WL 13268857, at *20 (S.D. Fla. Apr. 7, 2011), *report and recommendation adopted,* No. 09-61698, 2011 WL 13268858 (S.D. Fla. Aug. 25, 2011), the Court held:

> However, § 1395pp(a) clearly limits the liability of providers where the Secretary's polices are sufficiently ambiguous that a provider could not reasonably know that a service would not be covered. Moreover, the Secretary's own regulations provide that information furnished by Medicare intermediaries like First Coast are relevant to determine a provider's knowledge under the statute. As noted in *Yale-New Haven Hospital*, "[t]he fact that the intermediaries continued to pay for these services for a period of eight years after the manual provision was disseminated could

> reasonably be interpreted by [the provider] that payment would continue to be made." 162 F.Supp.2d at 68.
>
> Accordingly, the Court finds that Advanced Diabetes "did not know, and could not reasonably have been expected to know" that RQ tests would not be covered under Medicare. To the contrary, the state of play in early 2008, when First Coast began to deny RQ claims, gave every indication to a reasonable provider that Medicare covered RQ as a monitor for PIVIT in clinical trials.

Moreover, the Code of Federal Regulations highlights the acceptable standards of practice in the local medical community, as well as in documents publicly promulgated by CMS about coverage. *See* 42 C.F.R. § 411.406, *in passim*.

Furthermore, the Medicare Claims Processing Manual, Chapter 30, Section 10 (Financial Liability Protections), provides that the Social Security Act "protect[s] beneficiaries, healthcare providers, and suppliers under certain circumstances from unexpected liability for charges associated with claims that Medicare does not pay." Pursuant to the criteria set forth in Sections 30.1 and 30.2, FFLC is certainly entitled to a Limitation of Liability.

There is no inference to be drawn, or evidence which shows (direct or circumstantial), that FFLC knew or should have known that Medicare would not pay for Procenta when used as a skin substitute allograft to promote wound healing. *See* Affidavit of Kevin Lam; and AR Vol. 1, 44-46. There have also not been any notifications, written or otherwise, from the Medicare contractor concerning payment eligibility regarding Procenta products. Further, FFLC had not received any prior claim denials for related services. Once FFLC received notice that the first claim was

denied, FFLC immediately ceased utilizing Procenta. Additionally, the Administrative Record reflects that no advance beneficiary notice of non-coverage (ABN) was ever issued to the beneficiaries in question. Should FFLC have had any suspicion that Medicare would not cover Procenta, it would have notified the beneficiaries that Procenta was not covered by having them sign an ABN. The fact that no ABNs exist is further proof that FFLC had no knowledge that Medicare would not cover Procenta.

Most importantly, CMS has issued LCD L36377, which affirmatively provides coverage for application of skin substitutes under the circumstances presented herein. As noted above, the FDA has already made an independent assessment on the safety and effectiveness of Procenta, issuing specific TRG guidance on its homologous use.

C2C has routinely and historically extended coverage for Procenta. Contained in the administrative record are two sample C2C Reconsideration Decisions where C2C overturned First Coast Service Options, Inc.'s conclusion that Procenta is not medically necessary. AR Vol. 1, 296-307. C2C held that "the service is safe and effective" and qualified for Medicare coverage. *Id.* at 299. In addition to the QIC's attestation to the medical necessity, safety and efficacy of Procenta, it further corroborates that FFLC could not have reasonably expected that C2C and, in turn, CMS would reverse course and decline coverage for the same product and services.

The LOL provision was enacted to address precisely the circumstance presented here: a Medicare provider furnishes medically appropriate services to a Medicare beneficiary without knowing, and without reasonably being expected to know, that

Medicare ultimately will determine that the services are not covered. Where those statutory conditions are satisfied, Congress expressly provided that payment may be made notwithstanding the coverage determination. The statute recognizes that a provider should not be left to bear the financial consequences of a Medicare coverage determination that neither the provider nor the beneficiary could reasonably have anticipated at the time the services were furnished. *See* 42 U.S.C. § 1395pp(a).

That protection is particularly important here because FFLC is a small podiatry practice that provides necessary medical care to Medicare beneficiaries. FFLC did exactly what Medicare providers are expected to do: it treated Medicare beneficiaries and provided medically appropriate services in good faith. FFLC did not knowingly furnish services for which Medicare payment was unavailable, nor did it have any reason to anticipate that Medicare would later deny payment for the services at issue. Yet, under the Agency's position, FFLC is being forced to absorb the entire financial loss, notwithstanding its good-faith provision of medical care.

That result is contrary to the purpose and structure of § 1395pp. Congress did not intend for a provider who reasonably believed its services would be covered to become an uncompensated provider to Medicare beneficiaries merely because a coverage determination was subsequently made against it. To the contrary, the statute expressly distinguishes between providers who reasonably could not have known that Medicare would deny payment and providers who knew or reasonably should have known that payment would not be available. That distinction demonstrates the central role that provider knowledge plays in the LOL statute: where the provider lacks actual

or reasonably imputable knowledge of the coverage problem, the statute provides protection against the very type of uncompensated loss that has been imposed upon FFLC. *See* 42 U.S.C. § 1395pp(a)-(c).

This is not a case involving a provider knowingly furnishing excluded services, ignoring a prior determination, or continuing a pattern of inappropriate billing after receiving notice from Medicare. Rather, FFLC provided reasonable and necessary care to Medicare beneficiaries in the ordinary course of its medical practice, without knowledge that Medicare would ultimately determine that the services were not payable. The consequences of the nonpayment are substantial for a small medical practice like FFLC. It would be fundamentally inequitable to impose upon FFLC, after the fact, a financial obligation that it never would have voluntarily undertaken.

The LOL statutes should, therefore, be applied according to the protection that Congress intended it to provide. Here, FFLC provided medically necessary and reasonable services in good faith and neither the provider nor the beneficiaries knew, nor reasonably could have known, that Medicare would not pay. 42 U.S.C. § 1395pp prevents the provider from being left to bear the financial consequences of an unforeseen coverage determination. FFLC is precisely the type of provider that needs this protection as it is most vulnerable to the financial consequences of uncompensated Medicare services. FFLC will be grievously, financially harmed by non-payment.

## CONCLUSION

Considering the foregoing, the Council's four (4) Final Orders denying coverage of Procenta (Q4244) and the associated physician services (CPT 15271 and CPT

15275) are not supported by substantial evidence, constitute clear errors of law, and were arbitrary and capricious acts in violation of the Administrative Procedure Act.

Plaintiff had a good faith basis to believe that Procenta, when applied as a skin substitute allograft to wounds, would be covered by Medicare. Therefore, even if the Court finds that Procenta is not covered, pursuant to Section 1879 of the Social Security Act, 42 U.S.C. § 1395pp (Limitation on liability where claims are disallowed), Plaintiff should still be entitled to payment for the services appropriately rendered.

Respectfully, FFLC requests that this Court enter judgment in its favor, reverse the Secretary's four (4) Final Agency Orders, order CMS to reimburse FFLC for the claims at issue, and award prejudgment and post-judgment interest, reasonable attorney's fees, and costs of suit.

**CERTIFICATE OF SERVICE**

I certify that on this 14th day of October 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. District Court, Middle District of Florida, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

EDWARD L. LARSEN, ESQ., P.A.

By: *<u>/s/ Edward L. Larsen</u>*
Edward L. Larsen, Esq.
Counsel for Plaintiff
Florida Bar No.: 16700
2390 Tamiami Trail N., Suite 202
Naples, Florida 34103
(239) 643-0100
Ed@EdwardLarsenEsq.com